216 Cal.App.3d 862 (1989)
265 Cal. Rptr. 466
ALLEN E. SMITH et al., Plaintiffs and Appellants,
v.
BOARD OF SUPERVISORS OF THE CITY AND COUNTY OF SAN FRANCISCO et al., Defendants and Respondents.
Docket No. A043213.
Court of Appeals of California, First District, Division Two.
December 18, 1989.
*865 COUNSEL
Robert P. Capistrano for Plaintiffs and Appellants.
Louise H. Renne, City Attorney, and Paula Jesson, Deputy City Attorney, for Defendants and Respondents.
OPINION
BENSON, J.
This is an appeal from the denial of a preliminary injunction. For the reasons set forth below we shall remand the case to the trial court.

STATEMENT OF FACTS
On May 27, 1988, the Board of Supervisors (Board) of the City and County of San Francisco (City) issued a public notice that on June 27, 1988, it would hold a hearing on various reductions in medical and health services provided by the City. The notice stated that it was pursuant to Health and Safety Code[1] section 1442.5 and that at the end of the hearing, the Board would adopt a finding that the proposed changes would or would not have a *866 detrimental impact on the health care needs of those affected. Attached to the notice were 11 pages providing further details on the nature of the proposed reductions.
These reductions, which totaled $17.2 million, were initiated by the mayor's office in response to a projected budget deficit of $179 million. The mayor had asked city departments to prepare two budget reduction scenarios. The first would take place, assuming Board approval, if Proposition K (increase in the Gann spending limit) were approved. Scenario two would take place if Proposition K were rejected. The Board's notice of May 27, 1988, reflected each of these scenarios.
This budgetary process was in accordance with the City's charter. Under the charter, each department executive receives from every department and office within that department a budget estimate for the upcoming fiscal year. (S.F. Charter, art. VI, § 6.200.) These budget estimates are then transmitted to the mayor's office no later than the first day of March of each year. (Ibid.) The mayor may then hold hearings on these estimates and may decrease or increase them. (Id. at § 6.203.) The mayor is then required, not later than the first day of June of each year, to transmit to the Board the consolidated budget estimates for all departments for the coming year. (Ibid.)
The charter further requires that, on or before June 30 of each year, the Board enact an interim appropriation ordinance. (S.F. Charter, art. VI, § 6.205.) However, the charter specifically provides that the "[B]oard of supervisors may decrease or reject any item contained in the proposed budget, and may without reference or amendment to the detail schedule and positions and compensations, decrease any total amount for personal services contained in the proposed budget, but shall not increase any amount or add any new item for personal services or materials, supplies, or contractual services, for any department, unless requested in writing so to do by the mayor...." (Ibid.) Finally, the Board, after public hearing, and not earlier than the 15th day of July, nor later than the 1st of August of each year, must adopt the proposed budget as "submitted or as amended." (Ibid.)
Under this scheme the mayor submitted to the Board his budget proposals. The clerk of the Board then issued the public notice of those reductions on May 27, 1988.[2] Appellants, two indigent patients of county-funded health care facilities, brought an action for injunctive and declaratory relief on June 14, 1988. The action also sought a peremptory writ of mandate. They alleged that the May 27 notice did not comply with the requirements of section 1442.5; that section provides in pertinent part as follows: "Prior *867 to closing a county facility, eliminating or reducing the level of services provided, or prior to the leasing, selling, or transfer of management, the board shall provide public notice, including notice posted at the entrance to all county health care facilities, of public hearings to be held by the board prior to their decision to proceed. Such notice shall be posted not less than 30 days prior to such public hearings. The notice shall contain a detailed list of the proposed reductions or changes, by facility and service. The notice shall include, but not be limited to, the amount and type of each proposed change, the expected saving, and the number of persons affected.
"The board shall make findings based on evidence and testimony from these hearings that their proposed action will or will not have a detrimental impact on the health care needs of the indigents of the county. Such findings shall be included as part of the official public hearing record.
"Notwithstanding the board's closing of a county facility, the elimination of or reduction in the level of services provided, or the leasing, selling or transfer of management of a county facility subsequent to January 1, 1975, the county shall provide for the fulfillment of its duty to provide care to all indigent people, either directly through county facilities or indirectly through alternative means." (Italics added.)
Appellants filed their motion for preliminary injunction on June 15, 1988. In support of their motion they submitted affidavits in which they stated that they could not tell from the notice how they were going to be affected by the proposed reductions. In addition they submitted an affidavit from a public health nurse employed by the City who stated that she was unable to determine from the notice what impact the budget cuts would have in her area of public health. Finally, they submitted an affidavit of E. Richard Brown, an associate professor at the University of California at Los Angeles School of Public Health. In his affidavit Professor Brown stated that, based on his extensive experience, the May 27 notice was excessively vague, and was one of the "vaguest and least informative Beilenson notices"[3] that he had ever seen.
The City issued a second notice on June 21, 1988, which was posted at all county health services on that date and was distributed by mail to other interested parties on June 22. This notice provided much greater detail than the previous notice.[4] On June 24, 1988, the superior court denied plaintiffs' *868 motion for preliminary injunction. The Board proceeded with the June 27 hearing.

DISCUSSION

Mootness
Appellants' complaint sought to enjoin the Board's June 27 hearing; to obtain a declaratory judgment that respondents were in violation of section 1442.5 with respect to the hearing set for June 27; and to obtain a writ of mandate requiring respondents to carry out their duties under section 1442.5. (1) Neither this court nor the trial court could issue an injunction or writ of mandamus to prevent what has taken place. "The scope of available preliminary relief is necessarily limited by the scope of the relief likely to be obtained at trial on the merits." (Common Cause v. Board of Supervisors (1989) 49 Cal.3d 432, 442 [261 Cal. Rptr. 574, 777 P.2d 610].) (2) Also, as framed, the issue presented in the declaratory relief action is moot. We may, however, decide a matter of public interest which is likely to recur. Although an injunction can no longer be issued to postpone the June 27, 1988, hearing (see Chase v. Brooks (1986) 187 Cal. App.3d 657, 662 [232 Cal. Rptr. 65]), we may address important issues which are of great public interest, are likely to recur, and may otherwise evade appellate review. (See Liberty Mut. Ins. Co. v. Fales (1973) 8 Cal.3d 712, 715-716 [106 Cal. Rptr. 21, 505 P.2d 213].)
No case has addressed the issues of whether section 1442.5 applies to San Francisco and what information must be given in the notice required by that section. There is no dispute concerning the contents of two notices given by the City and these notices are before this court. The parties agree that even if we determine the issues to be moot this action presents an issue of great public interest which should be determined by this court. Both parties argue the merits of the issues presented. It is likely the issues presented will recur and appellate review may be evaded because of the short notice period required by the statute. (3) The construction of a statute and its application to a given set of facts are issues of law which this court may decide de novo; we are not bound by the trial court's resolution. (San Francisco Police Officers' Assn. v. Superior Court (1988) 202 Cal. App.3d 183, 188-189 [248 Cal. Rptr. 297]; Goddard v. South Bay Union High School Dist. (1978) 79 Cal. App.3d 98, 105 [144 Cal. Rptr. 701].) We shall proceed to decide the issues.

Whether the City Violated Section 1442.5
We must resolve two questions in determining the controversy. The first is whether section 1442.5 applies to all counties in the state or whether San *869 Francisco as a charter county is exempted from its application due to its unique budgetary process. Second, if we determine section 1442.5 does apply to San Francisco, then we must decide whether the May 27 notice complied with the statute.

The Statute
(4a) The language in dispute in section 1442.5 is found in the first two paragraphs of that section. Appellants contend the language of the section, by itself or through consideration of legislative intent, clearly demonstrates that it is to apply to all counties. Respondents assert, however, that given the unique budgetary process of San Francisco, this section does not apply to it.
(5) In interpreting a statute our primary objective is to ascertain the intent of the Legislature and to effectuate that intent. (San Diego Union v. City Council (1983) 146 Cal. App.3d 947, 954 [196 Cal. Rptr. 45].) As our Supreme Court further stated in Building Industry Assn. v. City of Camarillo (1986) 41 Cal.3d 810, 818-819 [226 Cal. Rptr. 81, 718 P.2d 68], "`[T]he "intention of the legislature will be determined so far as possible from the language of its statutes, read as a whole, and if the words of an enactment, given their ordinary and popular signification, are reasonably free from ambiguity and uncertainty, the courts will look no further to ascertain its meaning."'" Further, it is important to keep in mind that "`"[T]he objective sought to be achieved by a statute as well as the evil to be prevented is of prime consideration in [the word's] interpretation, and where a word of common usage has more than one meaning, the one which will best attain the purposes of the statute should be adopted, even though the ordinary meaning of the word is enlarged or restricted and especially in order to avoid absurdity or to prevent injustice."'" (Friends of Mammoth v. Board of Supervisors (1972) 8 Cal.3d 247, 260 [104 Cal. Rptr. 761, 502 P.2d 1049].)
(4b) With these basic rules as guides we turn to the specific words and phrases in section 1442.5 which are the subject of this dispute.
Respondents note that, unlike other counties, the Board does not have direct control over the budget. Rather, the budget is originated by the mayor, who then submits it to the Board, which in turn can reject it or make further decreases, but cannot increase it. The Board did not initiate the budget cuts which were the subject of the May 27 notice. Respondents then observe that section 1442.5 refers in several places to "their" (the Board's) proposed action or decision to proceed, and they argue that, since the budget reductions were not the Board's, but rather the mayor's, this section does not apply to San Francisco.
*870 We begin our analysis of this argument by first noting that the Legislature has supplied us with guidance as to its intent. The Legislature stated that it "[R]ecognizes the importance of the health care provided by counties to indigent residents through county hospitals and health care facilities. It is the purpose and intent of the Legislature by this act to insure that the duty of counties to provide health care to indigents is properly and continuously fulfilled." (Stats. 1974, ch. 810, § 1, p. 1764, italics added.) It would appear that it was the legislative intent to have this section apply to all counties regardless of the internal budgetary processes of those counties. This intent would be consistent with the language in section 1442 which makes it applicable to the "board of supervisors in each county." (Italics added.) Because section 1442 deals with the same general subject as does section 1442.5 (the closing or elimination of health services), the former must be read as part of section 1442.5, evidencing a legislative intent to have section 1442.5 apply to "each" and every county. (Scott Co. v. Worker's Comp. Appeals Bd. (1983) 139 Cal. App.3d 98, 105 [188 Cal. Rptr. 537, 34 A.L.R.4th 949].)
Respondent argues that, since the Board did not initiate the reductions those reductions are not "their[s]." Solely because the Board did not initiate the reductions, however, does not mean that the Board does not act. Under the charter the Board is charged with final approval of the budget.
This situation is not unlike that in Friends of Mammoth v. Board of Supervisors, supra, 8 Cal.3d 247, in which the court rejected the argument that the California Environmental Quality Act (EQA) applied only to public works projects and not projects for which a municipality issues only a permit. In rejecting this restrictive view the court noted that the "protection afforded by the EQA would be substantially diminished in an area where it may be most needed if the act were to be interpreted to cover only public works projects." (Id. at p. 264.) The same would be the case here if we were to adopt respondents' position.
(6) Respondents' argument also ignores another basic assumption of statutory interpretation; a specific statute must be considered with reference to the entire statutory scheme of which it is a part. (4c) Nothing in section 1442.5 suggests the Legislature intended to limit the counties to which the section applied. To interpret the section to exclude San Francisco would mean that the Legislature was acting by implication, and we will not presume such an action. (Rapid Transit Advocates, Inc. v. Southern Cal. Rapid Transit Dist. (1986) 185 Cal. App.3d 996, 1002 [230 Cal. Rptr. 225].)
Granted, the Legislature could have used the term "counties" rather than "board" in section 1442.5. Respondents point out that if that had been done *871 then it would have been clear that section 1442.5 applied to San Francisco, since in respondents' view, it is the City, and not the Board, which initiates the reductions. This view would appear to be in accord with the rule that where a statute contains a different word in one section than it does in other sections or in a similar statute concerning a related subject, then a different intent is shown. (Committee of Seven Thousand v. Superior Court (1988) 45 Cal.3d 491, 507 [247 Cal. Rptr. 362, 754 P.2d 708].) Both parties point out that sections 1442 and 1442.5 use the terms "board" and "county" in many different places. Further, in the Welfare and Institutions Code, the term "county" and "board" are used throughout, suggesting an appreciation by the Legislature of their respective roles.
However, to conclude from this usage that the Legislature intended to except from the statute counties such as San Francisco would not only undermine the express intent of the Legislature to apply the act to all "counties," but would lead to absurd results. (Sinnamon v. McKay (1983) 142 Cal. App.3d 847, 851 [191 Cal. Rptr. 295].) Further, even if the word "board" were to be read in such a limited way, we would not be held to that meaning if it were contrary to the clear intent of the statute. (Ibid.) In this case, we conclude that the Legislature intended the statute to apply to all counties regardless of their budgetary process. To read section 1442.5 in any other way would undermine that intent.
Finally, we note that the first notice of May 27, 1988, stated that the hearing was to be in accordance with section 1442.5. Although respondents now argue that reference was made out of an excess of caution, in the event that section 1442.5 could be held to apply to San Francisco, we find such an argument too self-serving. The Board, even before this litigation commenced, and with knowledge of the statute, stated it was holding a hearing in accordance with the statute.
We conclude that it was the unambiguous intent of the Legislature that section 1442.5 apply to all counties, including San Francisco.
We now turn to the issue of whether the May 27 notice complied with section 1442.5.

The Notice
(7a) We begin our analysis of whether the May 27 notice met the requirements of section 1442.5 by noting that section's recent history. As originally written the section required only "public notice." In 1982 the Legislature amended the section to add the requirement that "The notice shall contain a detailed list of the proposed reductions or changes, by facility *872 and service. The notice shall include, but not be limited to, the amount and type of each proposed change, the expected saving and the number of persons affected." (Stats. 1982, ch. 1594, § 7, p. 6305, italics added.) At the same time the notice period was reduced from 90 to 30 days. Moreover, under the section as amended, a board of supervisors could reduce service even if it found that such reduction would be detrimental. Thus, in apparent exchange for a reduced notice period and the authority to reduce services even if detriment were to be found, the requirements of the notice itself were expanded.
(8) An amendment to a statute making a material change bespeaks a legislative intent to change the meaning of the statute. (Jordan v. Consolidated Mut. Ins. Co. (1976) 59 Cal. App.3d 26, 48 [130 Cal. Rptr. 446].) (7b) Here, the Legislature clearly made a material change in the statute. The legislative intent was to go beyond the original statutory requirements and require a much more specific and detailed form of notice. That respondents did not comply with these new requirements is apparent in comparing the May 27 notice with the specific statutory requirements and with the June 21 notice which appellant concedes meets the requirements of section 1442.5. (See Appens. A & B.)
Section 1442.5 requires that the notice include "but not be limited to, the amount and type of each proposed change, the expected saving, and the number of persons affected." Although the May notice does tell us what the "bulk" savings will be for each category, it clearly does not detail the "amount and type of each proposed change." The services to be reduced at San Francisco General Hospital are simply stated as "Patient Advocates"; for Potrero Hill Health Center it is "Out patient - Satellite Clinics"; again at San Francisco General Hospital the cutbacks are stated in the broad categories of "Occupational Therapy," "Outpatient - Hospital Based Clinic," "UC Contract," and "Hospital Staffing." For community public health services the areas of cutback are again broadly stated as being "Contracts" or "Lab Tests," and although in some categories the number of positions to be cut are listed, the exact position(s) and their responsibilities is not listed. This pattern of general nondetailed listing of cutback areas are continued into the community mental health services area where again we find that cutbacks are to be in "Admin. and Program Supervision" or "Outpatient & Day Treatment." There we are not even benefitted by the department's assessment of how many positions will be cut let alone which positions. General and often vague statements of the type of each cutback are also found in the community substance abuse services division, the forensic services, and the public health central office where we are left to ponder the report of a $272,000 cutback in "Administrative" or a cutback in "various operating costs" in administration for the substance abuse services.
*873 By contrast, the June 21 notice provides extensive detail for cutbacks in the community public health services (CPHS) division. In that notice specific information on proposed cutbacks in contract services at the Rose Resnick Center, the Haight Ashbury Free Medical Clinic, and the Refugee Project is provided; whereas these specific facilities are not even separately named in the May 27 notice, a specific requirement of section 1442.5. Where the June 21 notice does list a service also listed on the May 27 notice, much more detail is provided. For example, the May 27 notice referenced "laboratory" cutbacks, to include three positions at a savings of $175,433, which would mean that community neighborhood clinics "that serve indigent patients will not receive all lab services," and that "[t]his may result in fewer clinics willing to treat indigent patients." The June 21 notice says that two microbiologists and one senior microbiologist positions will be cut, and further specific lab services would be affected, as well as which specific community clinics are served by the lab.
The June 21 notice provides much greater detail than the May 27 notice. This type of detail is the kind that we believe the statute prescribes. We also note that the May 27 notice does not provide additional detail as to San Francisco General Hospital, community substance abuse services division, forensic services division and the public health central office. Appellants correctly note that the descriptions of these cutbacks do not meet the statutory requirements.
Both parties to this appeal cite Santa Barbara Sch. Dist. v. Superior Court (1975) 13 Cal.3d 315 [118 Cal. Rptr. 637, 530 P.2d 605], and Carlson v. Paradise Unified Sch. Dist. (1971) 18 Cal. App.3d 196 [95 Cal. Rptr. 650], in support of their respective positions. Both cases dealt with the adequacy of school board notices under former section 966 of the Education Code, which provided that "[A]ll meetings of the governing board of any school district shall be open to the public, and all actions authorized or required by law of the governing board shall be taken at such meetings and shall be subject to the following requirements: .... [¶] (b) A list of items that will constitute the agenda for all regular meetings shall be posted at a place where parents and teachers may view the same to at least 48 hours prior to the time of said regular meeting...."
This provision, however, lacks the "detailed list" requirement found in section 1442.5. Therefore, the Supreme Court's holding in Santa Barbara, that a school board's notice of intent to adopt a desegregation/integration plan without mentioning which schools were to be affected by the plan satisfied section 966, does not support respondents' position that its May 27 notice satisfied section 1442.5, which contains much more stringent requirements.
*874 Carlson is also inapposite. In Carlson plaintiff sought to enjoin the defendant school board from closing an elementary school on the grounds that the board's notice of the board hearing to discuss the closure did not specify the school to be closed and therefore violated the requirements of section 966. Carlson, like Santa Barbara, focuses on entirely different statutory language than the language at issue here.
Respondents rely heavily on a letter dated December 20, 1982, from Dr. Peter Abbott, of the State Department of Health Services, which discusses the notice requirement of section 1442.5. Dr. Abbott stated the notice should contain all "major ideas or concepts to be discussed." He then went on to observe that "The notice should provide adequate information to allow a member of the general public (including persons who may not be knowledgeable about health systems or local government) to decide whether or not to attend the hearing and to prepare informed and relevant testimony if that person attends." The Department's attempt to guide counties in their compliance with section 1442.5 is welcomed. (9) This court, however, is not bound by such opinions, the interpretation of a statute being solely within our domain. Although construction of a statute by an administrative agency responsible for its implementation is entitled to some weight (Board of Supervisors v. Lonergan (1980) 27 Cal.3d 855, 866 [167 Cal. Rptr. 820, 616 P.2d 802]), it cannot prevail when there is an apparent contrary legislative purpose (Pacific Legal Foundation v. Unemployment Ins. Appeals Bd. (1981) 29 Cal.3d 101, 117 [172 Cal. Rptr. 194, 624 P.2d 244]). Moreover, the department of health services is not charged with the implementation of section 1442.5, and therefore the usual deference to administrative interpretation cannot be given here.
(7c) Further, where the statute requires a "detailed" notice, a notice that contains only the "major ideas or concepts" is not sufficient. This would not be the detailed notice contemplated by the statute; we refuse to accept that interpretation here.
Rather, we agree with Dr. Abbott's comments regarding the purpose of the notice. The aim of the statute to provide for fully informed and relevant testimony was fulfilled by the detailed notice issued by the Board on June 21. Only that quality of notice allows those attending the hearing to prepare useful testimony on such an important area as reductions in medical and health services.
Nor do we agree that the May 27 notice substantially complied with the statute. (10) Substantial compliance will suffice if the purpose of the statute is satisfied (Downtown Palo Alto Comm. for Fair Assessment v. City Council (1986) 180 Cal. App.3d 384, 395 [225 Cal. Rptr. 559]) but substantial *875 compliance means actual compliance in respect to that statutory purpose. (International Longshoremen's & Warehousemen's Union v. Board of Supervisors (1981) 116 Cal. App.3d 265, 273 [171 Cal. Rptr. 875].) The doctrine of substantial compliance excuses technical imperfections only after the statutory objective has been achieved. (International Longshoremen's & Warehousemen's Union v. Board of Supervisors, supra, at p. 273.)
Substantial compliance has been found where a clerk merely failed to timely stamp an order for a new trial (Dersherow v. Rhodes (1969) 1 Cal. App.3d 733, 745 [82 Cal. Rptr. 138]); where there were typographical errors (Stasher v. Harger-Haldeman (1962) 58 Cal.2d 23, 29 [22 Cal. Rptr. 657, 372 P.2d 649]); harmless misstatements in a form contract (Stasher, supra); failure to notify all property owners of a property assessment hearing where most of the owners had been notified (Downtown Palo Alto Comm. for Fair Assessment v. City Council, supra, 180 Cal. App.3d 384, 396); and where the complaint failed to name a corporate defendant although the defendant knew it was being served (Cory v. Crocker National Bank (1981) 123 Cal. App.3d 665, 671-672 [177 Cal. Rptr. 150]). (7d) Here, the statutory objective to provide for an informed public was not achieved by the May 27 notice. That notice was not merely technically imperfect; it was legally insufficient.
Moreover, the Court of Appeal for the Second District recently rejected a substantial compliance argument in Ibarra v. City of Carson (1989) 214 Cal. App.3d 90 [262 Cal. Rptr. 485]. In that case proponents of a municipal initiative began circulating the initiative petition for signatures three days before they complied with the posting requirement of Elections Code section 4003. (Id. at pp. 94-95.) The city clerk refused to place the measure on the ballot because, without the signatures that were collected during the three days before posting, there were not enough valid signatures to qualify the measure for the ballot. (Id. at pp. 93-94.) The superior court denied a writ of mandate to compel placing the measure on the ballot. (Id. at p. 93.) The Court of Appeal affirmed the denial; its language is instructive, although the case dealt with a different statute: "Where the purpose of the statutory requirement is to give information to the public to assist the voters in deciding whether to sign or oppose the petition, the substantial compliance argument is often rejected and strict compliance held essential. [Citations.] [¶] In the present case, as we have discussed, the requirement to give notice of intent prior to commencing circulation serves important purposes educating the public about the petition campaign before it begins." (Id. at p. 99.)
Here, as in Ibarra, the statutory requirement of both timely and sufficient notice also serves to educate the public, in this case about the proposed *876 reductions in health services; it also allows interested persons enough time to prepare presentations at the hearing. The timely but insufficient notice of May 27 did not fulfill the purposes of the statute. Further, the issuance of an acceptable notice on June 21 does not constitute compliance with the statute. (11) As pointed out long ago, "[w]here [a] statute prescribes a certain kind of notice, a court is not justified in saying that some other kind of notice would be equally effective." (Ferri v. City of Long Beach (1917) 176 Cal. 645, 647 [169 P. 385].) We cannot substitute one notice for another where time requirements of the statute have not been met. This is the case even if appellants were aware of the detailed notice prior to the hearing. (See Todd v. City of Visalia (1967) 254 Cal. App.2d 679, 684 [62 Cal. Rptr. 485].)
We therefore conclude that the May 27 notice did not meet the requirements of section 1442.5. The June 21 notice, to the extent it supplemented the May 27, notice, was statutorily sufficient, but it was untimely. It cannot cure the defects in the original notice.

DISPOSITION
We remand this case to the trial court with directions to dismiss the action on the ground that it is moot. Appellants are awarded their costs on appeal.
Kline, P.J., and Peterson, J., concurred.

*877 APPENDIX A

Notice of May 27, 1988

NOTICE
Notice is hereby given that the Board of Supervisors of the City and County of San Francisco will hold a public hearing on the effect of changes, including reductions, in services provided at the medical facilities of the City and County, which are proposed by the Mayor to take place in fiscal year 1988-1989, beginning July 1, 1988. The hearing shall be in accordance with the provisions of Section 1442.5 of the California Health and Safety Code. At the conclusion of the hearing, the Board shall adopt a finding that the proposed changes will or will not have a detrimental impact on the health care needs of the indigents of the City and County.
The Public Health Department has prepared the attached list of the proposed reductions. Further information can be provided by telephoning the Health Department at 554-2550. The listing is in two sections. One section shows the level of reductions if Proposition K on the June 7 ballot is approved. The second section shows the level of reductions if Proposition K is not approved.
The hearing will be held on June 27, 1988, at 4 p.m. in the Legislative Chamber on the second floor of City Hall. Public testimony, both oral and written, will be accepted.
 John L. Taylor
 Clerk of the Board
 - RECEIVED -
 JUN 8 1988
 S.F.N.L.A.F. EXHIBIT ___________

*878
DIVISION: SAN FRANCISCO GENERAL HOSPITAL 13
Annual number currently served: 350,000 - Outpatient
 80,000 - Emergency Room
 22,000 - Inpatient Admissions
 EXPECTED
 SERVICE(S) COST POPULATION
 PROVIDER/SITE ADDRESS REDUCED REDUCTION AFFECTED
San Francisco General Patient $75,000 Affects inpatients who
Hosp Advocates require wheelchair
1001 Potrero Ave. escorts for discharge or
San Francisco, CA 94110 ancillary services
 (35/day) or medication
 pickup for discharge
 (35/day).
Potrero Hill Health Outpatient - 250,000 Approx. 10,000 patients
Center Satellite served per year by
1050 Wisconsin St. Clinics SFMCOIP neighbourhood
San Francisco, CA (SFMCOIP) clinics will receive
 the same scope of
 services but experience
 longer wait times for
 appointments
Southeast Health
Center
2401 Keith St.
San Francisco, CA
South of Market Health
Center
551 Minna St.
San Francisco, CA
San Francisco General Occupational 107,000 Approx. 1,960 patients
Hosp Therapy a year receive this
1001 Potrero Ave. service which will be
San Francisco, CA 94110 be reduced.
 Outpatient - 250,000 Approx. 60,000 patients
 Hospital served per year by
 Based hospital based clinics
 Clinics will receive the same
 scope of service but
 experience longer wait
 times for appointments
 UC Contract 1,400,000 The patients served by
 SFGH will [BAD TEXT]
 reductions in various
 service areas but
 receive the same scope
 of service
 Hospital 300,000 All patients served by
 Staffing SFGH will experience
 delays in ancillary
 servic the hospital may
 have to divert more
 patients to other
 hospitals
 A1
 EXHIBIT __________
*879 DIVISION: COMMUNITY PUBLIC HEALTH SERVICES 14
An estimated 100,000 San Francisco residents are served by CPHS.
 EXPECTED
PROVIDER/SITE SERVICE(S) COST POPULATION
ADDRESS REDUCED REDUCTION AFFECTED 
CPHS MIA Program Contracts 17,182 Low-income residents
Admin. Ofc: without insurance
101 Grove, Room 323 will experience delays
 in health services.
CPHS Projects Contracts 89,719 There will be a
Admin. Ofc: reduction in
101 Grove, Room 318 transportation
Southeast Health Ctr 2 Positions services for
2401 Keith St. low-income residents
 and reductions in
 primary health care
 services to low-income
 residents and
 refugees.
Laboratory Lab Tests 175,433 Community neighborhood
101 Grove St. 3 Positions clinics that serve
 indigent patients will
 not receive all lab
 services. This may
 result in fewer
 clinics willing to
 treat indigent
 patients.
Laboratory - AIDS Lab Tests 316,835 Patients with sexually
101 Grove St. 7 Positions transmitted enteric
 diseases, such as
 parasites, will
 experience delays in
 treatments.
Health Centers AIDS In-home 77,261 Persons with AIDS/ARC
City-wide locations assessment will receive fewer
 and case home nurse visits.
 management.
 1 Position
Records & Statistics Birth and 133,214 The public will
101 Grove St death experience delays in
 registration receiving certified
 and copies of birth
 certification and death
 svcs 5 certificates.
 Positions
Disease Control TB, STD 156,699 Reduced TB satellite
CD - 101 Grove St Control 3 clinic hours and
TB - SFGH, Ward 94 Positions follow-up visits may
STD - 356 - 7th St lead to more cases of
 undetected
 tuberculosis.
Senior Health Svcs Contract svcs 8,015 Social day care services
 to seniors, who might
 otherwise be
 institutionalized,
 will be reduced by 30
 hours.
 A2
 EXHIBIT __________
*880 # served in Mental Health, Substance
 Abuse and [BAD TEXT] programs:
 35,000 served [BAD TEXT] with direct
 services; this does not include those
 served by information, referral &
 education services provided to all
 San Franciscans. 15
a) Division: Community Mental Health Services
 Expected Indigent
 Provider/Site Service(s) Cost Population
 Address Reduced Reduction Affected 
1. CMHS Administration Admin. and $630,000 Reduced level
 Program of program monitoring
 Supervision may result in
 disallowed costs;
 delays in contract
 processing and payment;
 delays in report
 processing for local
 and state agencies
2. Family Svc. Mental Health, $ 30,000 800 elderly and
 Agency Promotion seriously mentally ill
 1010 Gough St. individuals will not
 be served at this
 facility
 Aftercare, MIA $ 57,000 230 fewer clients and
 & Family Service families will be served
 at this facility
3. Bayview-Hunter's Mental Health $ 45,000 1200 fewer individuals
 Point Foundation Promotion will receive mental
 4301 - 3rd St. health promotion
 information from this
 program
 Outpatient & $ 80,000 150 fewer clients will
 Day Treatment receive outpatient
 services at this
 facility
4. Richmond Area Mental Health $ 41,000 1100 Youths and
 Service (RAMS) Promotion/ adults will not receive
 3626 Balboa St. Outreach mental health promotion
 services at this
 facility
5. UC/SFGH Case Mental Health $ 16,000 400 fewer seriously
 Management mentally ill clients
 401 Parnassus will be served by this
 program
 A3
 EXHIBIT __________
*881 16
6. Community Adv. $ 89,000 75 Advisory Board
 Boards members will not have
 Dist. I CAB staff support;
 2940-16th St. community involvement
 & public input in
 mental health
 Northeast CAB planning may be
 1182 Market St. reduced.
 District V CAB
 1351-24th Avenue
 SFGH CAB
 Dept. of Psychiatry
 1001 Potrero Ave.
7. Mercy Svcs. Corp Case Mgt. 114,000 200 clients - will
 (St. Mary's Hosp.) be transferred to
 450 Stanyan other CMHS programs:
 longer waits for
 services
8. UC Ctr. on Individual $126,000 70 hearing impaired
 Deafness Treatment & children and adults
 3333 California St. Evaluation will not be served by
 this program
9. a) Pacific Presb. Individual $126,000 70 children and adults
 2323 Sacramento Treatment will not be served
 by this program
 b) Soc. Skills Day Social Skills $ 33,000 10 clients will not be
 Treatment served by this program
 501 Hayes St.
10. All Contractors Contract $795,000 400 fewer clients
 Cost-of-living throughout the system
 Adjustments may not be served by
 the same program
11. Telecare Skilled Nursing $ 97,000 10 fewer Geriatric
 Geriatric/ Facility patients will be
 Garfield Hosp. served by this program
 1451 28th Ave.
 Oakland
12. Mt. Zion Adult Acute $400,000 500 fewer clients
 Hospital Community will receive crisis
 2330 Post St. Crisis services at this
 facility
 A4
 EXHIBIT __________
*882 17
13. Suicide 24-hour tel. $ 22,000 284 fewer clients
 Prevention crisis will receive crisis
 3940 Geary Blvd. telephone services
 from this program
14. Patients' Rights Compliance $ 24,000 140 fewer clients
 Advocacy Svcs. monitoring & served by this program
 complaint
 investigation
15. Chinese Newcomers Information & $ 31,000 2,174 fewer phone
 Service Referral in contacts for
 777 Stockton other languages information and
 outreach services will
 be available
16. 29th Street Clinic Outpatient $ 98,000 100 clients will be
 10-29th Street transferred to other
 clinics for services;
 they may experience
 longer waiting times.
17. Westside Crisis Outreach $112,000 125 clients will no
 Outpatient Clinc & evaluation longer be served
 1140 Oak Street outpatient by this program
 A5
 EXHIBIT __________
*883 Division: Community Substance Abuse Services
 18
 Expected Indigent
 Provider/Site Services(s) Cost Population
 Address Reduced Reduction Affected
Administration 11% reduce $ 53,516 Less grant
170 Fell St. Rm. 25 various applications to
San Francisco operating Federal, State &
 costs and Foundations.
 implement Elimination of 50% of
 reduced the medical contract
 work week evaluations
Administration Eliminates $178,516 900 Civil Service
170 Fell St., Rm. 25 7 positions employees/yr. will not
San Francisco (Lay-off 5) and receive reduced
 maintains Employee Assistance
 Employee Services. 5000 client
 Assistance contact sessions/yr.;
 Program (MOU) 1600 workshop
 at current participants; & 2800
 level. Cuts information calls would
 1 position be reduced
 reducing
 coordination of
 community
 service and
 grant writing
Contractors COLA Eliminates cost $182,000 320 clients will
 experience service
 delays
 of living
 increases to
 medical service
 contractors
Bayview-Hunter's Home visits, $ 14,830 60 Individuals and
Point Foundation information & Families, 1,156 people,
for Community referral, and will not receive
Improvement, Inc. education information/referral
(Center for Problem services services from this
Drinkers) program
5033 Third Street
San Francisco
San Francisco Evaluation, $ 5,250 600 fewer substance
Pretrial Diversion and advocacy abusing offenders will
Project, Inc. services for be served by this
885 Bryant St., persons program
2nd. Floor awaiting trial
San Francisco
 A6
 EXHIBIT __________
*884 Division: Community Substance Abuse Services
 19
 Expected Indigent
 Provider/Site Services(s) Cost Population
 Address Reduced Reduction Affected
Asian American counseling, $ 33,226 2,976 fewer will
Recovery Services, Inc. educational receive services from
2024 Hayes St. seminars, this program
San Francisco home visits
 to substance
 abusers
Youth Projects, Inc. counseling, $ 24,445 200 fewer will be
(Drug Detoxification home visits served by this program
Aftercare) non-narcotic,
529 Clayton non-maintenance
San Francisco medication
 services to
 drug users
San Francisco informational $ 13,253 2,750 fewer S.F.
Suicide Prevention, & referral residents will receive
Inc. to the public telephone based
(San Francisco information & referral
Drug Lines) services from this
3940 Geary Blvd. program
San Francisco
Multicultural prevention, $ 30,600 806 fewer clients
Prevention Center, education & (S.F. residents) will
Inc. information receive prevention/
1540 Market Street, services to education services
Suite 320 substance from this program
San Francisco abusers
Women's Alcoholism outpatient, $ 73,000 S.F. women with alcohol
Center day treatment problems
2261 Bryant St. & residential problems with children
San Francisco services to will experience delays
 women alcoholics in service
Pacific Mental counseling, $ 11,050 1,190 clients
Health Services, Inc. prevention with alcohol problems
(Operation Concern) education/ will not be served
P.O. Box 7999 information by this program
San Francisco, CA
94120-7999
Westside Community drug-free $ 56,000 180 clients, primarily
Mental Health counseling Tenderloin residents
Services, Inc. detoxification - with substance abuse
1153 Oak Street with symptomatic addictions, will not
San Francisco AIDS/ARC & be served by this
 other patients program
 A7
 EXHIBIT __________
*885 Division: Forensic Services
 20
 Expected Indigent
 Provider/Site Services(s) Cost Population
 Address Reduced Reduction Affected
1. Center for Spec. Outpatient $ 81,525 900 fewer clients
 Problems services served (criminal
 1700 Jackson St. justice clients &
 victims of crime) by
 this program
2. Sexual Trauma Crisis $ 49,600 240 fewer sexual
 Services evaluation and assault victims served;
 50 Ivy Street outpatient mandated 24-hour
 service will be
 provided at SF General
3. Jail Services Consent Decree $500,000 None projected
 850 Bryant St. positions
 1 Moreland Dr. budgeted, but
 San Bruno to be phased in
 during FY 88-89
4. Administration Admin. and $237,327 Compliance with legal
 101 Grove St. program mandates &
 certification
 requirements will
 receive less attention
 A8
 EXHIBIT __________
*886 Administers all Health
 Department programs in
 2 hospitals and public
 and mental health
 divisions.
DIVISION: Public Health Central Office
 21
 Expected
 Provider/Site Services(s) Cost Population
 Address Reduced Reduction Affected 
Department of Administrative $272,000  Payments to community
Public Health based agencies,
101 Grove St. and other service
San Francisco providers will be
 further delayed;
 delays in the
 processing of
 payrolls, grievances
 and other personnel
 matters may result.
  The ability to assess
 legislation, analyze
 programs and to seek
 grant funding may be
 restricted, with the
 result of fewer grant
 funds available to
 supplement City
 services, and more
 difficulty in
 effectively managing
 State regulated
 programs, including
 Medi-Cal, Medicare,
 other services to the
 indigent and others.
  Reduced facility and
 operations support.
 EMS Agency $ 46,000  Delays in analysis
 of data relevant to
 ambulance operations
 such as response
 time, and quality
 assurance oversight
 oversight of
 emergency medical
 and ambulance care.
 A9
 EXHIBIT __________
*887 22
Dept. of Public Health Environmental $368,000  Routine inspections
101 Grove St., SF Health to ensure the health
 and safety,
 appropriate
 sanitation services,
 and cleanliness of
 hotels will not be
 performed. Such
 inspections will be
 in response to
 complaints. There
 will be delays in
 responses to
 environmental
 complaints.
  Delays in training of
 City employees at
 low to moderate risk
 of toxics exposure.
 A10
 EXHIBIT __________
*888 23
 B. Reductions that will take effect if Proposition "K"
 does not pass:
 - SF General Hospital
 - Community Public Health Services
 - Community Mental Health Services
 - Community Substance Abuse Services
 - Forensic Services
NOTE: Reductions in this category are not proposed for Laguna
Honda Hospital or for Public Central Office.
 EXHIBIT __________
*889 48
DIVISION: SAN FRANCISCO GENERAL HOSPITAL
Annual number currently served: 350,000 - Outpatient
 80,000 - Emergency Room
 22,000 - Inpatient Admissions
 EXPECTED
 SERVICE(S) COST
 PROVIDER/SITE ADDRESS REDUCED REDUCTION POPULATION AFFECTED
San Francisco General Hospital $2,500,000 Reduced scope of
Hosp Staffing services in hospital
1001 Potraro Ave. and satellite clinics;
San Francisco, Service delays in
CA 94110 Medical Records,
 Housekeeping, Medical
 Social. Services,
 Dietary, and other
 areas; Possible
 problems with state
 licensing (Title 22)
 and JCAH standards.
Petrero Hill Health Outpatient - 100,000 Approx. 10,000 patients
Center 1050 Wisconsin Satellite served per year by
St. San Francisco, CA Clinics SFHCOIP neighborhood
 (SFHCOIP) [BAD TEXT] will
 experience the same
 scope of [BAD TEXT] but
 longer wait times for
 appointments
Southeast Health
Center 2401 Keith St.
San Francisco, CA
South of Market Health
Center 551 Minna St.
San Francisco, CA
San Francisco General MIA Professional 250,000 MIA patients will be
Hosp 1001 Potrero Ave. Fees served by resident
San Francisco, rather than attending
CA 94110 physicians, 3,200 MIA
 inpatients/year
 Outpatient - 250,000 Approx. 60,000 patients
 Hospital Based served per year by
 Clinics hospital based clinics
 will experience the
 same scope of services
 but longer wait times
 for appointments
 UC Contract 900,000 All patients served by
 SFGH will experience
 reductions in various
 service areas but
 receive the same scope
 of services
 Poison Control 138,000 45,237 calls received
 annually from S.F.,
 Alameda, Contra Costa,
 Marin, and San Mateo
 counties will need to
 be funded through
 increased revenues from
 these counties
 B1
 EXHIBIT __________
*890 49
DIVISION: COMMUNITY PUBLIC HEALTH SERVICES
An estimated 100,000 San Francisco residents are served by CPHS.
 EXPECTED
PROVIDER/SITE SERVICE(S) COST POPULATION
ADDRESS REDUCED REDUCTION AFFECTED 
Health Centers Medical, 1,036,876 Approximately 4,713
#1: 3850 - 17th St. educational clients per year by
#2: 1301 Pierce St. and public Health centers could be
#3: 1525 Silver Ave health nursing affected. Primarily
#4: 1490 Mason St. 17 Positions elderly clients in the
#5: 1351 - 17th St. Sunset District will no
CAS: 50 Ivy St. longer receive primary
 health care services at
 Health Center #5;
 health education
 involving issues such
 as AIDS, sexually
 transmitted diseases,
 substance abuse, etc.
 will be reduced
 throughout the district
 health centers; public
 health nursing programs
 in the schools will be
 eliminated; some
 adolescents may not
 receive care.
MCH Services to 187,980 Reduction in hearing
Admin. Ofc: disabled and screening and
101 Grove St. children 4 follow-up for school
 Positions children; reduction in
 medical, surgical and
 rehabilitation services
 to disabled children.
 B2
 EXHIBIT __________
*891 # [BAD TEXT Mental Health,
 [BAD TEXT] Abuse and Forensics
 programs: 35,000 served 50
 annually, with direct services;
 this does not include those
 served by information, referral
 & education services provided
 to all San Franciscans.
Division: Community Mental Health Services
 Expected Indigent
 Provider/Site Services(s) Cost Population
 Address Reduced Reduction Affected
1. Pacific Medical Social Skills $395,000 85 clients will not
 2323 Sacramento St. Day Treatment receive services
 at this facility
2. 29th Street Outpatient $150,000 150 clients transferred
 Clinic to other clinics;
 10-29th Street delays in service
 may result
3. As Yet Res. Facility $200,000 100 residential clients
 Undetermined will not be served by
 this program
4. As Yet Skilled nursing $200,000 44 fewer clients served
 Undetermined facilities in skilled nursing
 sub-acute care facilities
5. Various CMHS Outpatient $226,000 200 clients will not
 Clinics day treatment receive outpatient
 services from this
 program
6. Billing & Info. Billing & $ 75,000 Delay in collection of
 Service collections revenue
 551 Polk Street
7. As Yet Residential and $400,000 200 fewer clients
 Undetermined Outpatient will not receive this
 Contracts type of service
8. Episcopal Mental health $ 20,000 100 homeless clients
 Sanctuary promotion will not receive
 201 8th Street (homeless) outreach services from
 this program
9. Family Service Geriatric $ 83,000 100 Seniors and
 Agency and Family 50 family service
 1010 Gough St. clients will not
 receive services
 from this program
 B3
 EXHIBIT __________
*892 51
10. Tenderloin Peer counseling, $225,000 500 fewer clients
 Self-Help mental health served by this program
 Mental Health promotion
 Promotion
 191 Golden
 Gate Ave
11. Instituto Familiar MH Education, $ 15,000 600 children and adults
 de la Raza Outreach will not receive
 services from this
 2515 24th St. program
12. Operation Concern Mental Health $ 7,000 168 individuals will
 1853 Market St. Education not receive services
 from this program
13. District V Home Home visits $100,000 150 fewer clients will
 Visiting Team receive crisis home
 1351 24th Ave. visits and evaluation
 from this program
14. St. Mary's Hosp. Acute care $500,000 146 fewer clients
 450 Stanyan beds will be hospitalized
 St. Francis Hosp. at these community
 St. Luke's Hosp. hospitals
 other private hosps.
15. Mt. Zion Hospital Adult Acute $500,000 520 fewer clients
 2330 Post Street Community will receive crisis
 Crisis services from this
 service
 B4
 EXHIBIT __________
*893 52
Division: Community Substance Abuse Services
 Expected Indigent
 Provider/Site Services(s) Cost Population
 Address Reduced Reduction Affected
Harriet Street Ctr. Non-residential $243,503 2500 clients
444 - 6th Street Intake, alcoholics, drug
San Francisco, CA evaluation and abusers & families
 Individual will not be served
 counseling to by this program
 couples &
 families.
 Group counseling
 for Antabuse
 evaluation &
 maintenance
Women's Alcoholism Outpatient $ 73,000 30 women and
Center day care, and 40 children of
2261 Bryant Street residential S.F. women with
San Francisco services to alcohol problems
 women alcoholics with children
 will not be
 served by this program
 B5
 EXHIBIT __________
Division: Forensic Services
 Expected Indigent
 Provider/Site Services(s) Cost Population
 Address Reduced Reduction Affected
1. Youth Guidance 24-hour crisis $189,696 Follow-up services to
 Center services & 200-240 families and
 375 Woodside Ave. medical & youths will not be
 psychiatric available at this site
 outpatient
 services
2. Child, Crisis $ 97,221 120 fewer sexual abuse
 Adolescent services & victims who need
 Resource Center medical & follow-up care will be
 (CASARC) psychiatric served by this program
 B6
 EXHIBIT __________

*894 APPENDIX B

Notice of June 21, 1988
City and County of San Francisco Department of Public [BAD TEXT]
224

INFORMATION ON CHANGES IN PUBLIC HEALTH SERVICES
On Monday, June 27, the SF Board of Supervisors will hold hearings on proposed changes, including reductions in services provided at medical facilities of the City and County of San Francisco. Notice of the hearings was issued on May 27, 1988. Attached to the notice was a description of various changes in services provided by the Department of Public Health, including the Community Public Health Services Division.
Attached is further information on changes proposed for the Community Public Health Services Division of the SF Department of Health.
For more information, please call Beverly Hayon, Public Information Officer at 554-2550.
2698d

 *895
 Expected date of service changes: July 1, 1988
 225
 (1) CPHS MIA [BAD TEXT] - Attendant and Hospice [BAD TEXT]
 Medically Indigent Adults with AIDS/ARC: Staff of the Visiting
 Nurses Association provide care in the home for indigent persons
 with AIDS or with AIDS Related Conditions. Attendants who are
 trained by the agency, but are not licensed health care
 providers, assist clients to dress, bathe, clean, prepare meals,
 and run errands.
 Site: Services are provided in the patient's home;
 the contract is administered at 101 Grove Street, S.F.
 Nature of Reduction or Change: The services will continue to be
 provided through grants and Medi-Cal funding.
 Staff reductions: To be determined by contractor.
 Patients affected: Approximately 4 patients/day now receive
 this service. This will be reduced to 2 patients/day.
 Expected savings: $65,000/year.
 (2) CPHS Projects
 (A) Rose Resnick Center: The Health Department contracts with
 this agency to provide taxi vouchers for low-income and
 indigent persons who are handicapped or disabled, who need such
 assistance in order to get to medical appointments.
 Site; 1299 Bush Street
 Nature of Reduction or Change: None anticipated; thecut in
 City funding will be made up through other funding sources.
 Staff reductions: None.
 Patients affected: None anticipated.
 Expected savings: $4,000.
 (B) Height Ashbury Free Medical Clinic: The Clinic provides
 free primary health care; patients with any kind of medical
 problem, who want to see a doctor, are diagnosed and treated.
 Site: 558 Clayton Street
 Nature of Reduction or Change: All current services will
 continue to be provided, but there may be longer waiting
 times because of the reduction in contract funding.
 Staff reductions: 1 Registered Nurse, 2 Nurse
 Practitioners, 1 Physician Assistant. Hours may be reduced.
 Patients affected: The Clinic receives funding from various
 sources; because of the reduction described here, patients
 may experience delays in scheduling appointments.
 Expected savings: $25,000.
 (C) Refugee Project: Immigrants and refugees receive free
 primary health care; if they feel they need to see a doctor,
 they are treated by the project. They are provided with
 diagnoses of their problems, and treatment for the problem.
 Site: 1001 Potrero, S.F. General Hospital
 Nature of Reduction or Change: Current services will
 continue to be provided, but there may be longer waiting
 times because of the funding reduction.
 Staff reductions: One Health Worker/Translator reduced to
 .65 full time hours.
 Patients affected: The Clinic received funding from various
 sources; because of the reduction described here, patients
 may experience delays in scheduling appointments and will not
 have translation services available.
 Expected savings: $15,000
*896
 226
 Page Two: Community Public Health Changes effect: July 1, 1988
 (3) Southeast Health Center: Reference on page "A2" of the
 notice was in error. This change is described in the section of
 the notice regarding San Francisco General Hospital (pages "A1"
 and "B1").
 (4) Laboratory: Provides laboratory analyses of tests of blood,
 urine and throat cultures by physicians at community clinics
 (Haight Ashbury Free Medical Clinic, the Mission Neighborhood
 Health Center, the Southeast Health Center, the Potrero Hill
 Health Center, the South of Market Health Center, SFGH, and
 Health Centers.)
 Site: 101 Grove Street, S.F.
 Nature of Reduction or Change: Test analyses of blood, urine
 and throat culture to the community clinics (listed above) that
 diagnose patients with communicable diseases, rubella,
 tuberculosis, hepatitis, gastrointestinal salmonella will be
 reduced.
 Staff reductions: 2 "2462 Microbiologist"
 1 "2464 Senior Microbiologist"
 Patients affected: Physicians at these clinics send specimens
 for 20,900 clients a year for analysis at the Public Health
 Laboratories.
 Expected savings: $188,433
 (5) Laboratory: Provides laboratory analyses of blood, urine
 and throat cultures taken by physicians in Health Department
 clinics and health centers, and by physicians at community
 clinics (the Haight Ashbury Free Medical clinic, the Mission
 Neighborhood Health Center, the Southeast Health Center, the
 Potrero Hill Health Center and the South of Market Health
 Center.)
 Site: 101 Grove Street, S.F.
 Nature of Reduction of Change: 7 laboratory positions
 currently funded with City funds will be funded through AIDS
 grant funds for the purpose of HIV antibody testing analyses.
 These 7 positions also provided some testing of sexually
 transmitted enteric diseases, such as parasites. The testing of
 the sexually transmitted enteric diseases may be somewhat
 reduced because the AIDS grant funds may be used only for HIV
 testing analysis.
 Staff reductions: None; all positions will be funded by AIDS
 grant funds. However, 7 positions will be deleted from the
 General Fund budget:
 3 "2416 Bacteriology Laboratory Technician"
 2 "2462 Microbiologist"
 1 "2462 Microbiologist"
 1 "1424 Clerk Typist"
 Patients affected: Approximately 2,000 enteric disease
 specimens are analyzed in the labs each year. This number may
 be somewhat reduced.
 (6) Health Centers AIDS - AIDS Case Management and Liaison:
 Currently, the City funds 1.5 public health nurses to provide
 home nursing care, or to work on the streets to contact persons
 at risk of AIDS or ARC and to educate them in order to avoid
 their contracting the disease.
 Site: Services provided at home, or in the streets. Staff are
 administered through 101 Grove Street, S.F.
 Nature of Reduction of Change: No reduction in services is
 anticipated.
 Staff reductions: 1.5 positions will be funded with grant
 funds and no longer be reflected in the General Fund budget:
 1.5 "2830 Public Health Nurse"
 Patients affected: None anticipated.
 Expected savings: $77,261
*897
 Page Three: Community Public Health Changes effective July 1,
 1988 227
 (7) Records and Statistics Unit: The Records and Statistics
 Unit provides certified copies of birth and death certificates by
 mail and in person, and compiles data used to prevent the spread
 of disease.
 Site: 101 Grove Street, S.F.
 Nature of Reduction of Change: Birth and death certificates
 will be processed more slowly. Currently, they are processed
 within two days; after July 1 processing may take up to two
 weeks.
 Staff reductions: 5 "1404 Clerk"
 Persons affected: Anyone who needs a birth or death
 certificate may be affected.
 Expected savings: $133,214
 (8) Disease Control Clinics: Health Department Clinics that
 specialize in the treatment of sexually transmitted diseases
 serve all persons who may have contracted such diseases.
 Sites:
 Communicable Disease Clinic: 101 Grove Street, S.F.
 Tuberculosis Clinic: Ward 94, S.F. General Hospital,
 1001 Potrero St.
 Sexually Transmitted Disease Clinic: 356 7th Street,
 S.F.
 Nature of Reduction of Change: Procedures at each clinic will
 be changed as follows: only physician staff will discuss
 necessary followup treatment measures with patients; this may
 delay the scheduling of followup appointments. Currently, other
 clinical staff as well as physicians discuss followup ssues
 with patients. There will also be some delay in patients'
 receipt of drugs.
 Staff reductions: 1 "2806 Disease Control Investigator"
 1 "2586 Health Worker II"
 1 "2450 Pharmacist"
 Persons affected: Number treated at each clinic may experience
 longer waits or delays in their appointments.
 Expected savings: $156,699
 (9) Senior Health Services: The Health Department funds the
 Downtown Senior Center for services to seniors who would
 otherwise be institutionalized. These services entail
 recreational activities and other day care services that are
 provided by personnel who are not licensed health care providers.
 Site: Downtown Senior Center  481 O'Farrell Street
 Nature of Reduction of Change: Some of the seniors who require
 such services will be referred to other facilities, or will not
 receive these services.
 Staff reductions: .5 Social Worker (half-time)
 Persons affected: Approximately 3,067 of the 9,202 indigent
 seniors served through Health Department funding may be affected.
 Expected savings: $10,000.
*898
 Page Four: Community Public Health Changes effect July 1, 1988
 228
 (10) Health Centers Administration: Provides administrative
 services to the district health centers and clinics. In addition,
 provides information on the prevention of disease and promotion
 of public health for the public and health personnel.
 Site: 101 Grove St., S.F.
 Nature of Reduction of Change: Fewer persons will be available
 to provide the services described above.
 Staff reductions: 1 "1406 Senior Clerk"
 1 "2832 Supervising Public Health Nurse"
 1 "1424 Clerk Typist"
 1 "2320 Registered Nurse"
 1 "2824 Chief Health Educator"
 Persons affected: Not determinable; indirectly affects all
 users of public health services.
 Expected savings: $142,333
 (11) CAS - 50 Ivy Street - Tom Waddell Clinic: Currently, the
 Tom Waddell Clinic provides emergency medical services to
 individuals who come into the clinic at any time. As part of the
 Clinic's shift to specialization in the treatment of the
 homeless, and to AIDS/ARC patients in the Tenderloin/Civic
 Center/South of Market area, patients requiring emergency
 services between the hours of 12:00 midnight and 8:00 a.m. will
 be treated at the S.F. General Emergency Room.
 Site: 50 Ivy Street, S.F.
 Nature of Reduction of Change: Urgent medical services will no
 longer be provided at this site between the hours of 12:00
 midnight and 8:00 a.m.
 Staff reductions: 1 "2320 Registered Nurse"
 1 "1424 Clerk Typist"
 Persons affected: An average of 40 persons a week currently
 come to the Clinic during these hours.
 Expected savings: $78,000 in Community Public Health services.
*899
 COMMUNITY PUBLIC HEALTH SERVICES
 Expected date of service changes: July 22, 1988 or later 229
 (1) Health Center #5: Currently, the Health Center provides
 primary health care for people who need diagnoses and treatment
 for minor health problems or medical conditions, including
 regular checkups for infants and children.
 Site: 1351 24th Street, S.F.
 Nature of Reduction or Change: The Center will discontinue the
 medical services described above; patients will be referred to
 other health care facilities or providers, including the four
 other district health centers and S.F. General Hospital, which
 may consequently experience longer waiting times for
 appointments.
 Staff reductions:
 6 "2830 Public Health Nurse"
 1 "2320 Registered Nurse"
 2 "2230 Physician Specialist"
 Patients affected: Approximately 12,000 patient visits a year
 currently provided at Health Center #5.
 Expected savings: $621,286
 (2) Health Center #2: The Health Center provides primary health
 care for people who need diagnoses and treatment for physical
 problems or medical conditions, including regular checkups for
 infants and children. Physician services, and administrative
 services at Health Center #2 will be reduced.
 Site: 1301 Pierce Street, S.F.
 Nature of Reduction or Change: Physician time will be reduced
 by 20 hours a week, thus reducing the time for the Adult
 Screening Clinic by 10 hours. The adult screening clinic
 provides diagnoses for any adult who has a health or medical
 problem. In addition, the number of clerks, who process medical
 records and schedule appointments, will be reduced. This will
 lead to delays in the scheduling of appointments, and in the
 updating of records and billing information.
 Staff reductions: .5 Physicians (paid out of Temporary
 Salaries Account)
 Patients affected: Approximately 9,000 patient visits a year
 are provided at Health Center #2. 2,000 of these are provided
 in the Adult Screening Clinic.
 Expected savings: $37,500
 (3) Health Center #4: The Health Center provides primary health
 care for people who need diagnoses and treatment for physical
 problems or medical conditions, including regular checkups for
 infants and children. Provides outreach program to identify
 refugees or immigrants who need treatment but are unaware of the
 services that are available. The Women's Clinic provides routine
 checkups and diagnoses for women clients.
 Site: 1490 Mason Street, S.F.
 Nature of Reduction or Change: Refugee and immigrant outreach
 program will be reduced by 2 staff (currently, there are 3
 staff). Also, physician hours will be reduced by 20 hours a
 week, thus reducing the time for the Women's Clinic by 15 hours
 a week, from 20 hours to 5 hours.
 Staff reductions: 2 "2585 Health Workers"
 .5 Physicians (paid out of Temporary
 Salaries Account)
 Patients affected: Approximately 15,000 refugees and
 immigrants who need treatment are identified each year;
 approximately 92,000 patient visits a year are provided at the
 Health Center #4 Women's Clinic.
 Expected savings: $83,237
*900
 Page Two: [BAD TEXT] Public Health Changes [BAD TEXT] July 22,
 1988 or later
 (4) Materials and Supplies at the Health Centers: Staff at the
 five district health centers are required to follow careful
 infection control procedures in order to minimize the risk of
 infections to patients or staff.
 Site: Health Center #1: 3850 17th Street, S.F.
 Health Center #2: 1301 Pierce Street, S.F. 230
 Health Center #3: 1525 Silver Avenue, S.F.
 Health Center #4: 1490 Mason Street, S.F.
 Health Center #5: 1351 24th Street, S.F.
 Nature of Reduction or Change: Materials and supplies may be
 less readily available to Health Center staff. No direct
 patient effects anticipated.
 Staff reductions: None.
 Patients affected: No reduction in service is anticipated.
 Expected savings: $85,000.
 (5) Services in the Public Schools: The School District is
 mandated to screen its students to identify hearing problems and
 provide any necessary followup treatments. Currently, these
 services are provided by the Department of Health.
 Site: all public schools; administered at 101 Grove Street,
 S.F.
 Nature of Reduction or Change: The School District must assume
 the responsibility for these services and identify staff to
 provide them.
 Staff reductions: 3 "2538 Audiometrists"
 Patients affected: No reduction in service is anticipated.
 Expected savings: $187,980.
 0288n

NOTES
[1] All further statutory references are to the Health and Safety Code, unless noted otherwise.
[2] The notice and attachments thereto are attached as Appendix A to this opinion.
[3] Section 1442.5 is commonly called the Beilenson Act, after its author.
[4] This notice is attached as Appendix B to this opinion. Appellants concede that this notice complied with the statute as to specificity, but they argue that it was untimely and therefore ineffective.