[Crim. No. 16127. In Bank. July 21, 1972.]

In re NORMAN BURKE MINNIS on Habeas Corpus.

**COUNSEL**

Richard H. Levin, under appointment by the Supreme Court, for Petitioner.

Evelle J. Younger, Attorney General, Herbert L. Ashby, Chief Assistant Attorney General, Doris H. Maier, Assistant Attorney General, Russell Iungerich, William R. Pounders and Nelson P. Kempsky, Deputy Attorneys General, for Respondent.

## OPINION

**WRIGHT, C. J.**—We issued an order to show cause in response to the application of Norman Burke Minnis for a writ of habeas corpus on allegations that the Adult Authority (Authority) abused its discretion when, after considering a statement filed pursuant to Penal Code section 1203.01[1] in which the district attorney set forth what petitioner claims are "false opinions," it not only fixed his sentence at maximum and denied him parole but also declared that future applications for fixing petitioner's term at less than maximum or for parole would not be considered. Additionally, petitioner contends that the procedures adopted by the Authority to implement its statutory powers of term-fixing and parole-granting violate the due process, double jeopardy, and equal protection provisions in the state and federal Constitutions and thereby render invalid those provisions of the California Penal Code commonly known as the Indeterminate Sentence Law. Although we reject petitioner's contentions based upon claims of constitutional infirmities, we agree that the Authority did abuse its discretion in the present case.

Petitioner was found guilty by a jury of violating Health and Safety Code section 11911 (possession of restricted dangerous drugs for sale). He was sentenced to a term of imprisonment of six months to three years and is now at the California Institution for Men at Chino.

Petitioner was committed to the Department of Corrections on May 1, 1970. In September of 1970 he appeared before a panel of the Authority for parole consideration and term-fixing. The Authority denied parole and fixed his term at maximum, adding the following order to the administrative form CDC-245 which announced its decision: "No further consideration. Section 5077 PC complied with." Complaints made by petitioner's wife to the Governor and other officials prompted the Authority's executive committee to review petitioner's case, but the executive committee affirmed the decision of the panel.

First, petitioner contends that although the Authority evaluated his application for parole in accordance with its usual procedures, it refused to fix his term at less than maximum or to grant him parole on the basis of a "policy" that prisoners who have sold drugs or narcotics "purely for profit" should be retained in prison for the maximum term permissible. He argues that the failure of the Authority to consider the individual circumstances of each prisoner, including his conduct in prison and his disposition toward reform, is contrary to the purposes of the Indeterminate Sentence Law and

---

[1] All references are to the Penal Code unless otherwise indicated.

the parole system. It is urged, therefore, that the Authority abused its discretion by subsuming petitioner's case under a blanket rule.

To demonstrate that the Authority has adopted a policy of like treatment for a particular type of offender irrespective of other relevant circumstances, petitioner has submitted a copy of a letter written to his wife by a state assemblyman. The letter quotes the Authority's administrative officer as saying: "The position of the Adult Authority has been that persons engaged in selling narcotics purely for profit should serve a full sentence." Furthermore, the record supports an inference that petitioner's application did *not* receive individualized consideration. He has not suffered any prior convictions. Before his arrest, he frequently participated in and assisted with charitable activities. Since his imprisonment, he has been retained in minimum security institutions. The record is devoid of any suggestion that he has been a disciplinary problem and the administrator of a prison camp where petitioner spent several months has stated that petitioner "does have a lot to offer." The existence of this favorable information indicates that the Authority may well have acted pursuant to a general policy and not upon individualized consideration.

"The Indeterminate Sentence Law . . . was enacted in 1917. It divests the trial judge of power to fix the term of imprisonment for offenses punishable by imprisonment in a state prison . . . ."[2] (2 Witkin, Cal. Crimes (1963) p. 941.) The length of time a male defendant will spend in prison or on parole is determined, within statutory limits, by the Authority.[3] (See 2 Cal. Criminal Law Practice (Cont. Ed. Bar 1969) p. 510.) The Authority has the power to fix and refix each prisoner's term.[4] The Authority also has the power to grant parole[5] after the inmate has been in prison for the statutorily specified minimum period. (See *id.* at p. 521.)

[2]Penal Code section 1168 provides, in pertinent part: "Every person convicted of a public offense, for which imprisonment in any reformatory or state prison is now prescribed by law shall, unless such convicted person be placed on probation, a new trial granted, or the imposing of sentence suspended, be sentenced to be imprisoned in a state prison, but the court in imposing the sentence shall not fix the term or duration of the period of imprisonment. . . ."

[3]Penal Code section 5077 provides: "The granting and revocation of parole and the fixing of sentences shall be determined by the Adult Authority; provided, that the Adult Authority or one member thereof shall interview each prisoner at least once before the Adult Authority determines his sentence."

[4]Penal Code section 3020 provides: "In the case of all persons heretofore or hereafter sentenced under the provisions of Section 1168 of this code, the Adult Authority may determine and redetermine, after the actual commencement of imprisonment, what length of time, if any, such person shall be imprisoned, unless the sentence be sooner terminated by commutation or pardon by the Governor of the State."

[5]Penal Code section 3040 provides, in pertinent part: "The Adult Authority shall have the power to allow prisoners imprisoned in the state prisons to go upon parole outside the prison walls and inclosures. . . ."

This court has explained that "the purpose of the *indeterminate sentence law,* like other modern laws in relation to the administration of the criminal law, is to mitigate the punishment which would otherwise be imposed upon the offender. These laws place emphasis upon the reformation of the offender. They seek to make the punishment fit the criminal rather than the crime. They endeavor to put before the prisoner great incentive to well-doing in order that his will to do well should be strengthened and confirmed by the habit of well-doing." (*In re Lee* (1918) 177 Cal. 690, 692 [171 P. 958]; italics added. See also *Williams* v. *New York* (1949) 337 U.S. 241, 247-248 [93 L.Ed. 1337, 1342-1343, 69 S.Ct. 1079].) "In the general field of criminal law the Legislature has abandoned the ancient notion of categorical punishment, the infliction of fixed terms for certain crimes, and substituted the indeterminate sentence, leaving to the Adult Authority the judgment of the period of incarceration. *The Authority does not fix that period pursuant to a formula of punishment, but in accordance with the adjustment and social rehabilitation of the individual* analyzed as a human composite of intellectual, emotional and genetic factors." (*People* v. *Morse* (1964) 60 Cal.2d 631, 642-643 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810]; italics added; fns. omitted.)

We have similarly stated that "[t]he purpose and object of a *parole system* is to mitigate the rigor of the old [penitentiary system] and . . . to provide a more humane management and prison discipline under which there is extended to those who may show a disposition to reform and whose reformation may reasonably be expected, a hope and prospect of liberation from the prison walls under the restrictions and conditions of a parole. . . . [T]he interests of society require that under prison discipline every effort should be made to produce a reformation of the prisoner . . . . The legislative policy [was to provide a system whereby] a hope was to be held out to prisoners that through good conduct in prison and a disposition shown toward reformation, they might be permitted a conditional liberty upon restraint under which they might be restored again to society . . . ." (*Roberts* v. *Duffy* (1914) 167 Cal. 629, 634 [140 P. 260]; italics added; see also *People* v. *Morse, supra,* 60 Cal.2d 631, 642-643, fn. 9; *People* v. *Denne* (1956) 141 Cal.App.2d 499, 507-508 [297 P.2d 451].) The goals of the parole system can best be achieved by "the liberation of a prisoner on parole at the earliest period when permitted by law and when *on a consideration of the merits of each individual case,* parole ought, in the judgment of the board, to be granted." (*Roberts* v. *Duffy, supra,* at p. 637; italics added.)

■ Many factors are to be considered by the Authority in deciding whether to fix a sentence at less than maximum and whether to grant parole.

Although good conduct while incarcerated and potential for reform are not the only relevant factors,[6] this court has acknowledged their significance. (*In re Schoengarth* (1967) 66 Cal.2d 295, 300 [57 Cal.Rptr. 600, 425 P.2d 200]; *Roberts* v. *Duffy, supra,* 167 Cal. 629, 640.) Furthermore, the Authority has declared that these factors are among those of "paramount importance." (Cal. Adult Authority, Principles, Policies and Program (1952) pp. 8-9; see also Adult Authority Policy Statement No. 11 (June 27, 1966).) Any official or board vested with discretion is under an obligation to consider *all* relevant factors (cf. *People* v. *Wade* (1959) 53 Cal.2d 322, 338-339 [1 Cal.Rptr. 683, 348 P.2d 116]), and the Authority cannot, consistently with its obligation, ignore postconviction factors unless directed to do so by the Legislature.

A policy that all prisoners who have sold narcotics purely for profit should be retained in prison for the maximum period permitted under the Indeterminate Sentence Law completely disregards the individual prisoner's conduct in prison and his disposition toward reform. If the Authority has in fact adopted such a policy, alteration of the term of imprisonment cannot be used to reward a prisoner for good behavior or to punish him for improper behavior. Neither can it be used to encourage participation in rehabilitative programs designed to prepare an inmate for his return to the outside world. (See Johnson, *Multiple Punishment and Consecutive Sentences: Reflections on the Neal Doctrine* (1970) 58 Cal.L.Rev. 357, 382.) ■ If every offender in a like legal category receives identical punishment, prisoners do not receive individualized consideration. Such a policy violates the spirit and frustrates the purposes of the Indeterminate Sentence Law and the parole system.[7]

This court has traditionally accepted its responsibility to prevent an authority vested with discretion from implementing a policy which would defeat the legislative motive for enacting a system of laws. In the case of *In re William M.* (1970) 3 Cal.3d 16 [89 Cal.Rptr. 33, 473 P.2d 737],

---

[6]The nature of the offense, the age of the offender, his prior associations, his habits, his inclinations, his traits of character, and the interest in public security are also to be considered. (*In re Schoengarth* (1967) 66 Cal.2d 295, 300 [57 Cal.Rptr. 600, 425 P.2d 200].)

[7]The People cite *People* v. *Logan* (1966) 244 Cal.App.2d 795 [53 Cal.Rptr. 549] for the proposition that the Authority may fix the term at maximum and deny parole at the outset of imprisonment while refusing future reconsideration, all on the basis of the type of crime committed. We give *Logan* no such reading. That case said only that a prisoner may be retained in prison for the maximum period because, among other factors, he employed a high degree of violence in committing the crimes for which he was convicted. In contrast to the situation here, the *Logan* case did not concern a policy of like treatment for all persons convicted of a particular type of offense.

we were confronted with the issue of whether a juvenile court could establish a rule that all juveniles accused of a specified type of offense should automatically be detained prior to the jurisdictional hearing. There, a juvenile charged with selling marijuana was ordered retained at juvenile hall pending the hearing despite overwhelming evidence that the youth would receive adequate supervision at home and would not constitute a danger to society. We disapproved of the procedure employed in that case and stated: "The basic predicate of the Juvenile Court Law is that each juvenile be treated as an individual. The whole concept of our procedure is that special diagnosis and treatment be accorded the psychological and emotional problems of each offender so that he achieves a satisfactory adjustment. Nothing could be further from the spirit of the law than the absorption of the individual into a stereotype. A mechanized, mass treatment of offenders not only violates our deep conviction that each individual should personally obtain the protection of due process of law but also thwarts the legislative objective of providing the troubled youth of today with particularized treatment directed toward rehabilitation." (At p. 31.)

Prior to adoption of the Indeterminate Sentence Law, we disapproved a similarly arbitrary rule in *Roberts* v. *Duffy, supra,* 167 Cal. 629. There, the petitioner was a first offender who had been sentenced to five years in prison. After he had served over 14 months, he applied for parole pursuant to a statute which authorized the board of prison directors, in its discretion, to grant parole to a "first termer" after he had served one year of his sentence. The board refused to accept the petitioner's application or to hold a hearing because a rule adopted by it provided that "No application for parole shall be filed by the clerk until the prisoner shall have served one-half his sentence. . . ." Although acknowledging that a prisoner has no absolute right to parole, even if his conduct in prison has been exemplary, we noted the Legislature's intention that prisoners should have the right to apply for parole at the end of the statutorily specified period and condemned the board's rule.

The reasoning of *In re William M.* and *Roberts* v. *Duffy* is equally applicable to the term-fixing and parole-granting powers of the Authority. Under the Indeterminate Sentence Law, the limits of permissible punishment for drug and narcotic-related offenses are set by statute in the same manner as for all other criminal offenses. ■ By establishing indeterminate rather than fixed sentences, the Legislature demonstrated its intent that drug and narcotic offenders should receive individualized treatment. Although a prisoner is not entitled to have his term fixed at less than maximum or to receive parole, he is entitled to have his application for these benefits "duly considered." (*In re Schoengarth, supra,* 66 Cal.2d 295, 300.)

■ An administrative policy of rejecting parole applications solely on the basis of the type of offense with the result that the term of imprisonment is automatically fixed at maximum, although the Authority action includes a pro forma hearing and review of the cumulative case summary, does *not* satisfy the requirements of individualized treatment and "due consideration."

The record in the instant case supports an inference that petitioner sold drugs on a large scale. Under these circumstances, the Authority could have reasonably denied him parole and fixed his term at maximum when it initially considered his application. ■ Nevertheless, the nature of petitioner's offense does not justify the Authority's refusal *in advance* to consider future applications filed by this petitioner.

Consistent with the views expressed by the foregoing authorities, "[i]t is a part of the philosophy of the indeterminate sentence law and our whole penological system that, within prescribed limits, the length of terms of imprisonment and rights of parole shall be subject to redetermination from time to time. (See Pen. Code, §§ 1168, 3020, 3025, 3040, 3053, 3060, 3065.) The trend of modern theory on the subject is definitely away from attaching to judgments of conviction absolute finality insofar as the length of terms of imprisonment is concerned. The judgment of conviction, as such, retains full finality but the matter of length of terms of imprisonment and other elements of the penological process relating to punishment, rehabilitation, supervision, etc., are being largely severed from direct specific, or final control by the judgment of conviction." (*In re McVickers* (1946) 29 Cal.2d 264, 271-272 [176 P.2d 40];[8] see also *People* v. *Morse, supra,* 60 Cal.2d 631, 642-643.)

A male prisoner who, like petitioner, must serve a minimum term of six months' imprisonment, is entitled to an appearance before the Authority within six months after delivery into the custody of the Director of Corrections. (Adult Authority, Resolution No. 184 (March 14, 1972).) If the inmate's request for parole is denied, the order typically fixes the next hearing for one year later. (*In re Schoengarth, supra,* 66 Cal.2d 295, 302; see also 2 Cal. Criminal Law Practice (Cont. Ed. Bar 1969) p. 567.) ■ A determination on term-fixing and parole at the outset of imprisonment which precludes such future consideration nullifies the Legislature's intent that prisoners—particularly "first termers"—who demonstrate a receptiveness to reform and a disposition toward rehabilitation should receive

---

[8]Although the *McVickers* case concerned a petitioner who had been adjudged an habitual criminal, its language aptly describes the purpose of giving the Authority power to reconsider a previously fixed term. The term may be decreased for good conduct or increased for misconduct. (2 Witkin, Cal. Crimes (1963) p. 945.)

more lenient treatment. (See *Roberts* v. *Duffy, supra,* 167 Cal. 629, 635.) The result of such a determination is that some convicted persons are *categorically* denied early release or parole notwithstanding their good conduct in prison and their efforts at self-improvement. The indeterminate sentence imposed by the trial court becomes in actuality a *fixed* sentence for the maximum possible term, the incentive for rehabilitation is removed, and the Indeterminate Sentence Law and parole system are converted into "an empty formula of words." (See *People* v. *Westbrook* (1952) 411 Ill. 301 [103 N.E.2d 494, 495, 29 A.L.R.2d 1341].)

Courts of other jurisdictions with indeterminate sentence laws have dealt with analogous problems and have resolved the same in a manner similar to that which we herein express. (See *Bailey* v. *State* (1930) 23 Ala.App. 369 [125 So. 693]; *O'Day* v. *People* (1946) 114 Colo. 373 [166 P.2d 789, 790-791]; *People* v. *Johnson* (1953) 415 Ill. 628 [114 N.E.2d 667, 669]; *Ex parte Hamilton* (1915) 188 Mich. 499 [154 N.W. 567, 568-569]; *Ex parte Collins* (1915) 51 Mont. 215 [152 P. 40, 41]; *State* v. *Janiec* (1953) 25 N.J. Super. 197 [95 A.2d 762, 764]; see generally 29 A.L.R.2d 1344.)

We note that in the return to the order to show cause, the People concede that an order which withholds further parole consideration is "inconsistent with most other existing policies concerning review of inmate status." The Authority has voluntarily rescinded its previous policy and stated that, except in certain extreme cases where reconsideration of parole may be postponed for two or three years, the applications of all inmates should be reviewed at least annually. We approve of such a policy insofar as it guarantees the same periodic consideration to first-term drug offenders like petitioner as is given to other prisoners who are eligible for parole and term-fixing.

We turn to petitioner's constitutionally based contentions. He first argues that Penal Code section 1203.01[9] violates due process of law. Pursuant

---

[9]Penal Code section 1203.01 provides, in pertinent part: "Immediately after judgment has been pronounced, the judge and the district attorney, respectively, may cause to be filed with the clerk of the court a brief statement of their views respecting the person convicted or sentenced and the crime committed, together with such reports as the probation officer may have filed relative to the prisoner. The judge and district attorney shall cause such statements to be filed if no probation officer's report has been filed. The attorney for the defendant and the law enforcement agency that investigated the case may likewise file with the clerk of the court statements of their views respecting the defendant and the crime of which he was convicted. Forthwith after the filing of such statements and reports, the clerk of the court shall mail a copy thereof . . . addressed to the Department of Corrections at the prison or other institution to which the person convicted is delivered. The clerk shall also mail a copy of any statement submitted by the court, district attorney, or law enforcement

to section 1203.01, the district attorney may file a statement of his views concerning the person convicted and the circumstances surrounding the crime committed. In the instant case, after judgment had been pronounced, the district attorney who prosecuted petitioner filed a statement which petitioner claims contained "false opinions" that may have caused the Authority to view his application with disfavor.[10]

Although a prisoner may not have a right to be released on parole, parole cannot be withheld unless by means consonant with due process. (Cf. *Cafeteria Workers* v. *McElroy* (1961) 367 U.S. 886, 894 [6 L.Ed.2d 1230, 1235, 81 S.Ct. 1743]; *Sturm* v. *California Adult Authority* (9th Cir. 1967) 395 F.2d 446, 450 (Browning, J., concurring opn.).) " '[D]ue process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances. Expressing as it does in its ultimate analysis respect enforced by law for that feeling of just treatment which has been evolved through centuries of Anglo-American constitutional history and civilization, 'due process' cannot be imprisoned within the treacherous limits of any formula." (*Joint Anti-Fascist Refugee Com.* v. *McGrath* (1951) 341 U.S. 123, 162 [95 L.Ed. 817, 849, 71 S.Ct. 624] (Frankfurter, J., concurring opn.).) The exact boundaries of due process "are undefinable, and its content varies according to specific factual contexts. . . . Whether the Constitution requires that a particular right obtain in a specific proceeding depends upon a complexity of factors. The nature of the alleged right involved, the nature of the proceeding, and the possible burden on that proceeding, are all considerations which must be taken into account." (*Hannah* v. *Larche* (1960) 363 U.S. 420, 442 [4 L.Ed. 2d 1307, 1321, 80 S.Ct. 1502].) Any due process analysis necessarily requires a "balance of hurt complained of and good accomplished." (*Joint Anti-Fascist Refugee Com.* v. *McGrath, supra* (Frankfurter, J., concurring opinion), at p. 163 [95 L.Ed. at p. 849].) In essence, the reviewing court must consider the objectives sought to be achieved by the challenged procedure, the possible unfairness to the prisoner, and the availability of alternate procedures which are less burdensome to the prisoner.

---

agency, pursuant to this section . . . addressed to the attorney for the defendant, if any, and to the defendant in care of the Department of Corrections, and a copy of any statement submitted by the attorney for the defendant . . . shall be mailed to the district attorney."

[10]The relevant part of the district attorney's statement reads as follows: "This defendant was a well-educated college graduate with two years of graduate school, had been formerly a teacher with a teaching credential, and is now operating a service station. To the best of our knowledge he is not a user of drugs, he is merely selling the drugs for the financial gain to enable him to live to a style to which he wishes to raise himself. The quantities which the defendant sold were two kegs of 50,000 Seconal tablets each and he made some conversation with potential purchasers where he talked of being able to get in the neighborhood of a million tablets. He was attempting to set up a regular monthly quantity. . . ."

Because of his involvement with a case, the district attorney often has information bearing on the punishment which is appropriate for a particular prisoner. Section 1203.01 establishes a channel by which he can convey this information to the Authority. Under the terms of the statute, copies of the district attorney's statement are sent to the defendant and the defense counsel. The defense counsel can immediately reply in writing to the opinions of counsel for the People and the defendant can respond in writing or orally at the pre-term-fixing interview required by section 5077. Thus, section 1203.01 enables the Authority to secure information which is relevant, and in fact essential, to effective administration of the indeterminate sentence and parole laws without incurring the unnecessary burden of a second fact-finding process. ■ Adequate safeguards are built into the statute, and we can detect no unfairness in the procedure adopted therein. Neither does the record suggest that the statement in question was prompted by bad faith or unfounded in fact.

Next, petitioner contends that procedures established by the Authority to implement section 5077[11] deprive the prisoner of due process because he receives " no representation at the sentencing," and violate the proscription against double jeopardy because the prisoner is forced to undergo "two or more trials and sentences on the same charge."

This dual contention is based upon the incorrect assumption that proceedings before the Authority constitute a trial. ■ However, judicial proceedings terminate when conviction is announced and sentence, albeit for an indeterminate period, is imposed. (*In re Sandel* (1966) 64 Cal.2d 412, 415-416 [50 Cal.Rptr. 462, 412 P.2d 806].) Proceedings before the Authority are administrative in nature. (*In re Schoengarth, supra,* 66 Cal. 2d 295, 304; see also *In re Sandel, supra,* at pp. 415-416.) Consequently, due process takes on a different significance in evaluating that agency's determination on term-fixing and parole-granting than it had at trial.

■ In the past, this court has declared that counsel is not necessary to insure fairness at post-conviction proceedings to fix term and consider the granting of parole.[12] (*In re Schoengarth, supra,* at p. 304.) ■ Because proceedings before the Authority are not judicial in nature, we have also held that post-conviction proceedings concerning term-fixing and parole are not retrials, and that the power conferred on the Authority by section

---

[11]Section 5077 gives the Authority the power to grant or revoke parole and to fix sentence. (See *ante,* p. 643, fn. 3.)

[12]In *Morrissey* v. *Brewer* (1972) 408 U.S. 471 [33 L.Ed.2d 484, 92 S.Ct. 2593], the Supreme Court was concerned with the sufficiency of the hearing in proceedings on revocation of parole. As the instant case involves only the fixing of term and the granting of parole, *Morrissey* has no direct application here. (See 408 U.S. at p. 480 [33 L.Ed.2d at p. 494].)

5077 does not violate the constitutional prohibition against double jeopardy. (*In re Gullatt* (1968) 69 Cal.2d 395, 398 [71 Cal.Rptr. 676, 445 P.2d 292]; see also *People* v. *Dorado* (1965) 62 Cal.2d 338, 360 [42 Cal.Rptr. 169, 398 P.2d 361]; *Carter* v. *California Adult Authority* (9th Cir. 1970) 433 F.2d 978.) Petitioner has shown us no reason to depart from our prior holdings, and we have found none.

Finally, petitioner contends that if the Authority acted properly in setting his term at maximum and denying further parole consideration, he is effectively serving a fixed term and should receive "good time" credits afforded other prisoners who have been sentenced on a fixed term basis.[13] Essentially, petitioner is arguing that he is being denied equal protection. In view of the conclusions previously expressed in this opinion, it is unnecessary to reach this contention.

The Authority is directed to consider petitioner's application for parole and to consider whether his term should be fixed at less than maximum. This order is to be complied with at the earliest practicable opportunity. Since petitioner is not now entitled to release, the order to show cause is discharged, and the petition is denied.

McComb, J., Peters, J., Tobriner, J., Burke, J., and Sullivan, J., concurred.

---

[13]Prior to 1947, section 2920 provided for a system allowing deductions from the term fixed for satisfactory behavior. (2 Witkin, Cal. Crimes (1963) p. 946.) Recognizing the logical incompatibility of a system of credits with the Indeterminate Sentence Law, the Legislature adopted section 2926 which states that "No prisoner received on or after January 1, 1948 . . . shall receive or be allowed any credits provided for in this article." (See the amending act, Stats. 1947, ch. 1381, § 1.)