[No. A112673. First Dist., Div. Three. July 24, 2006.]

In re LIBER R. ANDRADE on Habeas Corpus.

**COUNSEL**

Michael Satris, under appointment of the Court of Appeal, for Petitioner.

Bill Lockyer, Attorney General, James M. Humes, Chief Assistant Attorney General, Frances T. Grunder, Assistant Attorney General, Anya M. Binsacca and Scott C. Mather, Deputy Attorneys General, for Respondent.

OPINION

**PARRILLI, J.**—In this case we hold that the Board of Prison Terms (Board)[1] misconstrued section 2402 of title 15 of the former California Administrative Code, now California Code of Regulations, by requiring an inmate to have parole plans in both California and Mexico. The prisoner is serving a life sentence for murder and has a hold placed on him so he can be deported to his native country of Mexico. At the time of the commitment offense, the prisoner was in the United States illegally and remains an illegal alien. Despite the Board's erroneous interpretation of section 2402, we affirm the Board's decision to deny parole solely on the basis of the commitment offense.

Petitioner Liber R. Andrade was convicted in 1982 of second degree murder and aggravated assault and was sentenced to a term of 17 years to life. His minimum eligible parole release date was January 30, 1991. Because Andrade is an illegal alien from Mexico, the Immigration and Naturalization Service (INS)[2] placed a "hold" on him, indicating its intent to deport him to Mexico. At his first parole hearing, on March 22, 1990, he was found to be suitable for parole, and the Board set a June 1995 release date. However, in May 1995 the Board rescinded his grant of parole for "nondisciplinary reasons." Since then, petitioner has had seven additional suitability hearings, including one on November 17, 2004, the results of which he is challenging by this petition. At the November 2004 hearing the Board based its determination that petitioner was not suitable for parole on two factors: the commitment offense, which it described as "violent and brutal" and which it found "demonstrate[d] a disregard for human life" and the need for petitioner to have viable parole plans in California. Petitioner challenges the Board's determination that he is not suitable for parole on multiple grounds. Among those, he claims the Board insists he develop parole plans in both Mexico, to which he anticipates he will be deported, and California, in case he is not deported. After requesting informal briefing on the subject, we issued an order to show cause and directed that counsel be appointed for petitioner. We now conclude that in reaching its November 17, 2004 decision, the Board relied on a clearly erroneous interpretation of section 2402 of title 15 of the California Code of Regulations; nonetheless, we affirm the Board's decision to deny parole based solely on the characteristics of the commitment offense.

## FACTUAL AND PROCEDURAL HISTORY

On September 5, 1981, two vehicles nearly collided, resulting in a verbal altercation between Andrade, a passenger in one of the cars, and the driver of

---

[1] The Board is now the "Board of Parole Hearings."

[2] The INS is now the "Bureau of Citizenship and Immigration Services."

the other car. This exchange blocked traffic and one of the people caught in the resulting traffic jam got out of his car and exchanged words with Andrade. When Andrade tried to get out of his car, that person kicked Andrade's car door shut. Once Andrade successfully got out of his car the two men started to fight and Andrade's adversary pulled a knife on him, cutting his neck. Nonetheless, the fight ended and onlookers and participants generally departed. A short time later, as two of the bystanders were leaving, they saw Andrade walking towards them with a shotgun. Andrade had retrieved the weapon from his apartment, which was nearby. As petitioner aimed the shotgun at them, they yelled, "We're not in it, we're not in it." Andrade believed that one of these bystanders, who was dressed similarly to his antagonist, was the man who had assaulted him. He fired three shots at the two bystanders, killing one and injuring the second. At the time of the incident, petitioner was 24 years old; the victims were 18.

At the November 2004 hearing, Andrade explained his actions: "I was upset. Somebody had wounded me, had tried to kill me, and I feel the need to retaliate or to make them know that I—they couldn't—they couldn't just mess with me." On another occasion, petitioner explained his mental state at the time as follows: "I am not a punk, I have a dignity to establish. I being the only Mexican, they had to steer clear off my path . . . or hurt." Petitioner also stated that if today someone insulted his dignity, he would not respond as he did back then, asserting, "I have learned. I'm a mature man. I'm a grown man."

After his arrest that evening, Andrade was taken for medical treatment and it was determined that he had a blood-alcohol level of .09 grams percent. He admits he had been drinking at the time.

Based on these events, the "Life Prisoner Evaluation," a report completed for the Board's consideration of an inmate's suitability for parole, found three aggravating factors: (1) the vulnerability of the victim, who had not provoked petitioner, but was merely a witness to the earlier fight; (2) the fact that petitioner had the opportunity to desist, but did not; and (3) the fact that petitioner used a firearm during the commission of the crime. That same report also noted one mitigating factor: petitioner's lack of an arrest history, either as a juvenile or an adult.

A review of the records the Board had available to it and the transcript of the suitability hearing reveals the following. Andrade was born in Guadalajara, Mexico, in 1957. He entered the Mexican Army at the age of 17 and served

for approximately three and one-half years when he was honorably discharged. In 1977 he married and had two children from that marriage. Since then he has remarried,[3] but maintains contact with his children. He worked as a machine operator in Mexico. In 1980 he entered the United States illegally and ultimately found employment as a furniture assembler.

During his incarceration Andrade earned both a GED certificate and a high school diploma. In prison he completed vocational training in automotive, electronics, shoe repair, and asbestos management. At the time of the 2004 hearing, he worked as a program clerk and had received a satisfactory report from his supervisor. He also received a laudatory notation in his record, dated April 6, 2004, for performing his work as a clerk in "an exceptional manner." He participated in various therapy and self-help activities, including Alcoholics Anonymous (AA), a Rational Behavior Training Group, two different anger management groups, the Yokefellow Counseling Program (a substance abuse education program), and two self-confrontation programs. He was a tutor in the literacy program and a member of the Men's Advisory Committee. He participated in the Protestant Chapel Christian Ministries, interpreting for Spanish-speaking participants and playing music. A correctional officer noted on December 5, 2003, in Andrade's record that "he has been able to reach many of [the other inmates participating in a Life Experience course] and assist them in turning their lives around. He [*sic*] work—and work ethics are outstanding and he accepts full responsibility for his actions. If he's granted parole he would be a productive citizen and an asset to any community he resides in."

During his incarceration petitioner received two "CDC 115 Rules Violation Reports," one, in 1985 for not being in his assigned cell, and a second in 1995 for falsifying a pass to go to chapel. He has received seven "CDC 128A Custodial Counseling Chronos," the most recent two being respectively in 1997 for failing to report to his assigned work area and 2003 for having a photocopy of a $50 bill and having one dollar in his locker. At the time of the November 2004 suitability hearing, he had been discipline-free since his last hearing; none of his discipline involves violence.

---

[3] As of the June 26, 2001 suitability hearing, petitioner's second wife was living in the United States, but intended to return to Mexico if Andrade were deported there. The whereabouts of petitioner's second wife were not specified during the 2004 hearing. Regardless of where she is or whether they are still married, based on the lack of references to her at the 2004 hearing, it appears that petitioner is not relying on her as a pivotal person in his postrelease plans.

Petitioner's psychological evaluation documented that he suffers from "alcohol dependence in institutional remission." It goes on to note that he has "no record of aggression or violence in prison" and "has maintained a long-term presence in AA."[4]

At the hearing, the Board also reviewed Andrade's parole plans. It observed that he has "an active US INS hold to Mexico," and determined that upon release he plans to live with his mother in Guadalajara. In the Board's file was a letter, signed by 17 individuals, including petitioner's mother, stating that they would help provide him with housing and transportation, that jobs were available, and that they were offering him "all of our efforts and warmth of home to help him reintegrate into the community." If paroled to Mexico, petitioner stated he would seek work as a mechanic, an area in which he has experience. In addition, the Board reviewed two other letters from potential employers, stating they would employ Andrade upon his return to Mexico. Finally, the Board reviewed a letter from the president of AA Services stating that "the fellowship of AA in this location will welcome you in your mission to rehabilitate."

The Board also determined that Andrade had no current release plans in California and that his relatives who had previously lived in California have returned to Mexico.[5] In opposing petitioner's release, the deputy district attorney expressed doubts about the relevance of petitioner's lack of parole

---

[4] The report further notes: "[His] [o]verall adaptation to prison life has been positive and constructive. . . . He fully acknowledges the wrongfulness of [his] actions. He takes full responsibility for the offense and does not appear to rationalize or minimize his role. He appeared to fully express remorse for his actions. When asked, he shared extensive expressions of guilt to remorse. This inmate appears to feel guilty for his actions and can emphasize [sic] his emotional level with the harm done to the victim and victim family. The inmate has demonstrated a good awareness of the circumstances resulting in his committing a serious offense. The inmate is not diagnosed [with] an antisocial personality disorder . . . Mr. Andrade has been able to demonstrate a consistency since his last psychological report of April 25th of '03. He has managed to remain disciplinary-free [sic], continues to participate in self-help group, and program in a positive manner. The inmate also continues to verbally express psychological insight into the nature of his crime and the role of his alcohol abuse . . . Mr. Andrade is aware of the dangers of alcohol and realizes the importance of total abstinence from alcohol and participation in AA meetings in [sic] an ongoing basis. There are no barriers (indiscernible) from a mental health standpoint, and prognosis for maintaining his level of functioning is good. Within a controlled setting it appears that the inmate's propensity for violence is less than that of an average inmate and within the community it would also be less than that of the average citizen."

[5] Andrade once did have parole plans in California. At that time, Andrade was denied parole in part because of the lack of documentation of adequate plans in Mexico. At his most recent hearing, Andrade indicated that he no longer had any relatives in California because they have returned to Mexico. Presumably, his current lack of a California-based support system coupled with the fact that it is illegal for him to work in this country are significant impediments to his developing realistic parole plans in California.

plans in California, since he is expected to be deported, saying, "I wouldn't think that would be relevant but if it is, he doesn't have any."

At previous hearings, the Board emphasized the importance of petitioner developing parole plans in Mexico. At a January 26, 1999 hearing, Commissioner Giaquinto, after establishing that Andrade was not a United States citizen, told him, "They don't keep convicted murders anymore in the United States if they're not citizens. You're going to be deported so unless your country goes to war or something like that, like San Salvador or some place like that, you're going to go back." At a June 26, 2001 hearing he was told that he had "some real support from California," but that he needed to have supportive letters in English in his country of origin because "with the immigration hold on you, you will more than likely be returned to your country of origin in Mexico. . . ." When Andrade was denied parole in 2002, the Board noted, without commenting about the need for any plans in California, that his parole plans were Mexico based. Then, the sole impediment to his being paroled seemed to be the gravity of petitioner's commitment offense. Again, at his 2003 suitability hearing, the only comment the Board made about his parole plans was the need to inquire about self-help or substance abuse programs available in Mexico "the country of his most probable parole."

On November 17, 2004, the Board found Andrade "not suitable for parole [because] he would pose an unreasonable risk of danger to society or a threat to public safety if released from prison." It therefore denied his parole for one year, with the decision becoming final on March 17, 2005. In support of its decision the Board concluded that "[t]he commitment offense was carried out in a violent and brutal manner," and that despite the fact that "he has viable parole plans in Mexico and a job offer," "he needs parole plans for California and a job offer. The reason for this is that when he is released from prison there is no guarantee that he will be released to Mexico. So plans must be made for California." After noting the district attorney's opposition to Andrade's being paroled, the Board reviewed the "positive aspects of [petitioner's] behavior," but concluded that these "do not outweigh the factors of unsuitability."

Petitioner then filed two petitions for writs of habeas corpus with the superior court. One was decided on June 30, 2005, and concluded that the Board's November 2004 decision denying parole did not compromise petitioner's right to due process or inflict cruel and unusual punishment on him because it required him to develop parole plans in California. A second writ petition was denied on October 14, 2005. It raised the issue of whether his term is disproportionate to his offense, when compared with punishments for more serious crimes. On January 17, 2006, petitioner petitioned for a writ of

habeas corpus in this court raising the issues addressed in both superior court petitions. After requesting informal opposition, we issued an order to show cause and appointed counsel for petitioner.

## DISCUSSION

The superior court correctly determined petitioner's proportionality argument is not viable because proportionality is only to be considered after suitability is determined. Thus, the Board determined the inmate was not suitable for parole because his release would pose an unreasonable risk to society; it was unnecessary to engage in a proportionality analysis. There is no need, therefore, to discuss further the proportionality of the petitioner's sentence. (*In re Dannenberg* (2005) 34 Cal.4th 1061, 1084 [23 Cal.Rptr.3d 417, 104 P.3d 783], cert. den. 546 U.S. 844 [163 L.Ed.2d 109, 126 S.Ct. 92].)

We also observe at the outset that the Board based its decision on two factors: the characteristics of the "Commitment Offense" (see Cal. Code Regs., tit. 15, § 2402, subd. (c)(1)), and petitioner's lack of California-based parole plans (see Cal. Code Regs., tit. 15, § 2402, subd. (d)(8)). In his return, the Attorney General emphasizes that the Board's discretion in parole matters is "great" and "almost unlimited." (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 655 [128 Cal.Rptr.2d 104, 59 P.3d 174], cert. den. (2003) 538 U.S. 980 [155 L.Ed.2d 669, 123 S.Ct. 1808].) Moreover, "the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the [Board]." (Cal. Code Regs., tit. 15, § 2402, subds. (c) & (d); *Rosenkrantz, supra,* 29 Cal.4th at p. 679.) Our review cannot be a reweighing of the evidence (29 Cal.4th at p. 677), and is limited.

Despite the considerable limitations on our review, judicial review of Board decisions is not merely pro forma. (See, e.g., *In re Scott* (2004) 119 Cal.App.4th 871 [15 Cal.Rptr.3d 32] [holding that Board erred because there was not "some evidence" that inmate's commitment offense demonstrated that he was not suitable for release or that he had an unstable social history, and that Board erred by not considering substantial evidence that he was suitable for release].)

As explained below, based on our review of the Board's November 2004 decision,[6] we affirm the decision to deny parole. However, we also have

---

[6] After oral argument was concluded petitioner filed an unopposed motion for leave to supplement the record with the transcript of the petitioner's parole consideration hearing held May 2, 2006. We grant that motion, noting that in that decision the Board denied Andrade parole based solely on the commitment offense. Petitioner urges us to reopen this case to consider the merits of the Board's May 2 decision. The May 2 decision is not yet final. Furthermore, nothing in the record suggests that the May 2 decision has been reviewed by the

determined that the Board's requirement that inmates such as Andrade have parole plans both in this country and in their native lands is an issue of great importance, likely to recur, and may otherwise evade appellate review. (See *Smith v. Board of Supervisors* (1989) 216 Cal.App.3d 862, 868 [265 Cal.Rptr. 466].) We thus reach the question of whether such a requirement is a reasonable interpretation of the applicable regulation.

*Parole Plans for California*

Prison authorities routinely consider an inmate's deportation status in determining how to classify prisoners. (See, e.g., *Mohammed v. Sullivan* (8th Cir. 1989) 866 F.2d 258 [INS detainer resulting in increasing security and custody determination].) It seems a logical extension to consider that status in parole deliberations. We do not question the Board's consideration of an inmate's deportation status. Deciding where parole plans should be developed can obviously be affected by that status. Our inquiry is focused on whether the Board can require parole plans in California and Mexico when the probability of deportation is high.

■ In considering his parole plans, the Board was implicitly construing section 2402, subdivision (d)(8) of title 15 of the California Code of Regulations, which indicates that the Board should consider whether "[t]he prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release." (Cal. Code Regs., tit. 15, § 2402, subd. (d)(8).) A positive answer to that question is to be regarded as a factor suggesting the inmate is suitable for parole. (*Ibid.*) The Board's interpretation of its own regulations is accorded great weight. Nonetheless, it remains subject to judicial review to determine if the Board's interpretation is clearly erroneous. (See *In re Richards* (1993) 16 Cal.App.4th 93, 98–99 [19 Cal.Rptr.2d 797]; *Bentley v. Swoap* (1974) 43 Cal.App.3d 165, 168–169 [117 Cal.Rptr. 479].)

The Board determined that California parole plans were mandatory because "there is no guarantee that [petitioner] will be released to Mexico." In affirming this view, the superior court cited *United States v. Female Juvenile* (1st Cir. 2004) 377 F.3d 27 for the proposition that an "INS hold is not a deportation order, [but merely] serves as a request that another law enforcement agency notify the INS before releasing an alien from detention so that the INS may arrange to assume custody over the alien."

The statutory scheme does require the appropriate INS official to "determine promptly" whether to issue a detainer when there is reason to believe

---

superior court. The issue of the May 2 decision was not addressed at oral argument and the Attorney General has not briefed any issues raised by that decision. Accordingly, we decline to consider whether the May 2, 2006, decision is supported by "some evidence."

that an alien, arrested by a federal, state, or local law enforcement official, has not "been lawfully admitted to the United States or otherwise is not lawfully present" here. (8 U.S.C. § 1357(d).) If issued, a detainer "serves to advise another law enforcement agency that the Department [of Justice] seeks custody of an alien presently in the custody of that agency, for the purpose of arresting and removing the alien. The detainer is a request that such agency advise the Department, prior to release of the alien, in order for the Department to arrange to assume custody, in situations when gaining immediate physical custody is either impracticable or impossible." (8 C.F.R. § 287.7(a) (2006).) Thus, there is no certainty that an alien who is subject to an INS detainer will be deported. But where the alien concedes he has entered the country illegally, is a convicted murderer,[7] and plans to return to his native country, there is a great probability that when he is released from prison he will be expeditiously deported.

■ *Brewer v. Patel* (1993) 20 Cal.App.4th 1017, 1021 [25 Cal.Rptr.2d 65] summarizes how a court interprets a regulation. "The fundamental rule of interpretation is to ascertain the intent of the agency issuing the regulation so as to effectuate the purpose of the law . . . To determine that intent, we turn first to the words of the regulation, giving effect to the usual meaning of the language used . . . . When statutory language is clear, we must apply that language without indulging in interpretation." Here, the regulation requires an inmate to have *"realistic* plans for release" (italics added) or to have "developed marketable skills that can be put to use upon release." Although the record recites the significant vocational training Andrade has received in prison, the Board's decision makes no mention of that training or the likelihood Andrade could put it to use once paroled. Although the Board did not specifically discuss whether petitioner's plans were realistic, the implication of its reasoning suggests it believed the plans were not sufficiently realistic because they did not cover the contingency of Andrade's remaining in the United Sates.

The Oxford English Dictionary defines "realistic" (after the initial definition referring to artistic or literary realism) as "concerned with, or characterized by, a practical view of life." Webster's New World Dictionary (1995) defines "realistic," the adjectival form of "realism," as the "tendency to face facts and be practical." Similarly, Webster's Ninth New Collegiate Dictionary (1991) in defining the adjective "realistic" also references "realism," which it defines as a "concern for fact or reality and rejection of the impractical and visionary." These definitions are in accord with the common usage of the word. For example, one might contrast the "perfect" house one hopes to

---

[7] Title 8 United States Code section 1101(a)(43)(A) classifies murderers as aggravated felons for immigration purposes. Aggravated felons are "conclusively presumed" to be deportable. (8 U.S.C. § 1228 [(d)](5), (c).)

purchase with one that is "realistic," given the buyer's basic needs and budget; similarly, one may compare "realistic" vacation plans, made taking into account real-world economic and time constraints, with one's "dream" vacation. Thus, based on its clear language, the regulation's requirement that an inmate have parole plans is limited to requiring realistic plans. The entire thrust of the regulation is on practicality. Nothing in the regulation requires an illegal alien "conclusively presumed" to be deportable (see fn. 6, above) to have fail-safe parole plans in two different countries. It is a significant burden to develop two plans—to maintain and develop the social and economic relationships necessary to live potentially in either of two places. For an illegal alien convicted of murder, who cannot work here legally and whose employer would face sanctions for employing him (see 8 U.S.C. § 1324a), this is an unrealistic burden. More importantly, the regulation does not suggest that such foolproof plans are necessary. The plain language of the regulation supports the opposite conclusion. By referring to "realistic" parole plans, the regulation does not contemplate ironclad and unrealistic plans.

Moreover, the state cannot assert that because the federal government might not deport petitioner, it becomes the petitioner's burden to develop plans to remain in the United States. Both his presence and employment here would be illegal. Although we are sensitive to the workloads and budgetary constraints of all involved, we cannot require the prisoner to plan for the contingency that the government might fail to do its job of deporting him. By law, in order to work in this country an alien must first obtain an appropriate labor certification; unless an alien is a legal permanent resident or has appropriate authorization he cannot be employed in this country. (8 U.S.C. §§ 1182(a)(5)(A), 1324a.) It is self-evident that the government may not require as a condition of parole that someone arrange to violate the law. But this is precisely what the Board's insistence that an illegal alien have employment plans in this country does. (See *Martin v. Marshall* (N.D.Cal. 2006) 431 F.Supp.2d 1038 ["The Governor's reasoning [regarding petitioner who was subject to deportation] would require petitioner to make plans to enter the United States illegally, and then communicate those illegal plans to the Board in order to be granted a release date. This argument is untenable. . . ."].) We also reject the Attorney General's suggestion that someone in petitioner's position attempt to legalize his immigration status as precisely the kind of unrealistic planning not mandated by this regulation. It defies common sense to suggest that a convicted murderer, residing in a state prison and conclusively presumed to be deportable, should apply to the same government that is under a duty to deport him for permission to work and remain legally.

By requiring petitioner to develop parole plans in both California and Mexico, the Board is holding him to a higher standard than the standard required by California Code of Regulations, title 15, section 2402. Although

one cannot say with absolute certainty that petitioner will be deported upon release from state custody, it is realistic to assume he will be. Accordingly, he need only have realistic parole plans in Mexico to satisfy the requirements of section 2402, subdivision (d)(8). Thus, at petitioner's 2004 hearing the Board erroneously viewed the fact Andrade only had parole plans in Mexico as a factor that militated *against* his being found suitable for parole. In fact, his Mexico-based parole plans should have been seen as a factor supporting his suitability for parole.

In construing this regulation we are not holding that the Board is barred from ever requiring a prisoner facing deportation to develop parole plans in the state. It may be that because of other circumstances (e.g., inmate not convicted of an aggravated felony or the inmate is eligible for asylum), that a prisoner's deportation is not a near certainty, as it is here. In such circumstances it may be realistic for the inmate to develop plans for remaining in this country.[8] In many cases, including the one before us, the Board would be able to discharge its responsibility by conditioning parole upon a prisoner's release to INS custody. (See Pen. Code, § 3053 [Board may impose any "conditions that it may deem proper" on parole]; *In re Schoengarth* (1967) 66 Cal.2d 295, 300–301 [57 Cal.Rptr. 600, 425 P.2d 200] [parole may be conditioned on release to another sovereign]; cf. *In re Korner* (1942) 50 Cal.App.2d 407, 408 [123 P.2d 111] [parole conditional on defendant's release to immigration authorities for deportation].)

*Our Decision to Affirm the Board's Decision to Deny Parole*

It is appropriate to affirm the Board's decision, rather than remand the matter for further consideration by the Board, where it is clear the Board would have reached the same conclusion had it not made any error. "We may uphold the parole authority's decision, despite a flaw in its findings, if the authority has made clear it would have reached the same decision even absent the error." (*In re Dannenberg, supra,* 34 Cal.4th at p. 1100.) Here, given the Board's decision in May 2006, there is no doubt that the Board would have denied parole in 2004, based solely on the commitment offense.

The Attorney General contends that even if we find that the Board improperly considered the petitioner's parole plans, we should deny the petition based solely on the characteristics of the commitment offense. We agree and affirm the Board's decision on that basis. A parole denial may be

---

[8] As pointed out above, the regulation allows for a broad inquiry by the Board, directing it to consider whether the "prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release." (Cal. Code Regs., tit. 15, § 2402, subd. (d)(8).) Alternate parole plans in the United States would be appropriate where the inmate has a realistic chance of obtaining appropriate authorization to be here.

properly based on the nature of the commitment offense alone. (*In re Dannenberg, supra*, 34 Cal.4th at p. 1094; *In re Rosenkrantz, supra*, 29 Cal.4th at p. 682.) Here there were multiple victims; petitioner evidenced disregard for human life by shooting innocent bystanders. Petitioner actually left the scene of the near-accident, returned to his home, retrieved a gun, and then went back to where the incident had started; in other words, although he was convicted of second degree murder, there is evidence that he used the time between the near-accident and the actual shootings to plan the crime, rather than to cool off. In short, there is "some evidence" which supports the Board's decision to deny parole. There is adequate support for the Board's decision that Andrade was not suitable for parole because his commitment offense was especially "violent and brutal." Furthermore, there is no case authority to support petitioner's claim that someone who had been convicted of second degree murder and use of a deadly weapon and sentenced to a term of 15 years to life plus a two-year enhancement, has a cognizable claim for a due process violation once he has been incarcerated for nearly 23 years (as he had been at the time of the Board's 2004 decision). Petitioner presents no evidence why we should so hold in his case.

## DISPOSITION

The petition for habeas corpus is denied.

McGuiness, P. J., concurred.

**POLLAK, J.,** Concurring and Dissenting.—I concur fully in the conclusion that petitioner's failure to develop viable parole plans in California, as well as in Mexico, cannot under the circumstances described in the majority opinion properly be regarded as a factor showing him to be unsuitable for parole. However, I disagree strongly with the conclusion that the finding of the Board of Prison Terms, now the Board of Parole Hearings (the Board), that petitioner is unsuitable for parole, can be sustained based solely on the circumstances of petitioner's commitment offense. In my view, there is no evidence in this record tending rationally to show that petitioner "will pose an unreasonable risk of danger to society if released from prison" (Cal. Code Regs., tit. 15, § 2402, subd. (a)),[1] and there is overwhelming uncontradicted evidence to the contrary.

---

[1] In *In re Dannenberg* (2005) 34 Cal.4th 1061, 1091 [23 Cal.Rptr.3d 417, 104 P.3d 783], the Supreme Court equated the term "suitable" with safety: "The regulations specify numerous factors the Board is to consider in determining whether the prisoner is suitable—i.e., safe—for parole." "[A] determination of unsuitability is simply shorthand for a finding that a prisoner currently would pose an unreasonable risk of danger if released at this time." (*In re Smith* (2003) 114 Cal.App.4th 343, 370 [7 Cal.Rptr.3d 655].)

All further references to regulations are to title 15 of the California Code of Regulations.

The Board has exceptionally broad discretion "to identify and weigh the factors relevant to predicting 'by subjective analysis whether the inmate will be able to live in society without committing additional antisocial acts.' " (*In re DeLuna* (2005) 126 Cal.App.4th 585, 591 [24 Cal.Rptr.3d 643], quoting *In re Rosenkrantz* (2002) 29 Cal.4th 616, 655 [128 Cal.Rptr.2d 104, 59 P.3d 174] (*Rosenkrantz*).) In reviewing a decision of the Board finding an inmate unsuitable for parole, "the court may inquire only whether some evidence in the record before the Board supports the decision to deny parole, based upon the factors specified by statute and regulation." (*Rosenkrantz, supra,* at p. 658.) The evidence relied on by the Board, however, must be "reliable" (Regs., §§ 2402, subd. (b), 2281, subd. (b)); it must have " ' "some indicia of reliability." ' " (*In re Scott* (2005) 133 Cal.App.4th 573, 591 [34 Cal.Rptr.3d 905].) Additionally, " 'the requirement of procedural due process embodied in the California Constitution (Cal. Const., art. I, § 7, subd. (a)) places some limitations upon the broad discretionary authority of the Board.' [*Rosenkrantz, supra,* at p. 655.] A prisoner is entitled to 'an individualized consideration of all relevant factors.' (*Ibid.*)" (*In re DeLuna, supra,* 126 Cal.App.4th at p. 591.) The Board's decision "must reflect an individualized consideration of the specified criteria and cannot be arbitrary or capricious." (*Rosenkrantz, supra,* 29 Cal.4th at p. 677.)

While "a prisoner may be deemed unsuitable for release on the basis of the commitment offense 'alone' . . . [citation], [this] proposition must be properly understood. The commitment offense is one of only two factors indicative of unsuitability a prisoner cannot change (the other being his 'Previous Record of Violence'). Reliance on such an immutable factor 'without regard to or consideration of subsequent circumstances' may be unfair [citation], and 'runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation.' [Citation.] *The commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison.*" (*In re Scott, supra,* 133 Cal.App.4th at pp. 594–595, fns. omitted, italics added.) "Thus, denial of release solely on the basis of the gravity of the commitment offense warrants especially close scrutiny." (*Id.* at p. 595.)

In March 1990, petitioner was found by the Board to be suitable for parole and nothing in his subsequent exemplary behavior suggests any basis for changing this evaluation. While in prison he obtained a GED degree in 1988

and a high school diploma in 1995. As of the parole hearing that is now before us, he had been participating in Alcoholics Anonymous (AA) for many years and had twice completed a self-confrontation program offered within the prison. He has been a volunteer tutor in a prison literacy program, an active participant in the Protestant Chapel Christian Ministries, and a "very reliable, hard working, and a productive individual . . . as assignment clerk." According to one report on petitioner that appears in the record, petitioner has "demonstrated a quality (indiscernible) every effort to better himself. He is an active member of AA and attended numerous other self-help seminars such as Anger Management and Self-Confrontation. He is (inaudible) and to his positive attitude. At Life Experience he has been able to reach many of them and assist them in turning their lives around. H[is] work—and work ethics are outstanding and he accepts full responsibility for his actions. If he's granted parole he would be a productive citizen and an asset to any community he resides in."

The latest psychological evaluation of petitioner assessing his dangerousness that appears in the record is similarly positive: "Low factors include no prior juvenile/adult criminal record, no prior felony convictions or prior misdemeanor convictions, no record of aggression or violence in prison. He has maintained a long-term presence in AA. Overall adaptation to prison life has been positive and constructive. The offense was not committed during the commission of another crime. The inmate acknowledged he committed the offense. He fully acknowledges the wrongfulness of [his] actions. He takes full responsibility for the offense and does not appear to rationalize or minimize his role. He appeared to fully express remorse for his actions. When asked, he shared extensive expressions of guilt to remorse . . . and can [empathize] his emotional level with the harm done to the victim and victim['s] family. The inmate has demonstrated a good awareness of the circumstances resulting in his committing a serious offense. The inmate is not diagnosed an antisocial personality disorder. The criminal-mindedness and criminality did not appear to be primary elements of the inmate's offense. Circumstantial, institutional factors appeared to play a significant role in the offense." The psychologist noted that "[a]lcohol played a significant role" in petitioner's offense. Further, petitioner "has been able to demonstrate a consistency since his last psychological report of April 25th of '03. He has managed to remain disciplinary-free, continues to participate in self-help group, and program in a positive manner. The inmate also continues to verbally express psychological insight into the nature of his crime and the role . . . his alcohol abuse contributed to this distorted pattern of thinking.

Mr. Andrade is aware of the dangers of alcohol and realizes the importance of total abstinence from alcohol and participation in AA meetings in an ongoing basis. There are no barriers (indiscernible) from a mental health standpoint, and prognosis for maintaining his level of functioning is good. Within a controlled setting it appears that the inmate's propensity for violence is less than that of an average inmate and within the community it would also be less than that of the average citizen."

In addition to all of these unqualified personal factors, petitioner has family and realistic employment opportunities awaiting him upon his return to Mexico—all of which under the Board's regulations tends to show petitioner's suitability for parole. (Regs., § 2402, subds. (c), (d).) What then is it about the nature of his offense that indicates that despite all of these positive indicators, petitioner will pose an unreasonable threat to public safety if released? While in a rage and under the influence of alcohol, petitioner committed a one-time offense, for which he has now served 25 years in prison. He has taken the appropriate steps to eliminate his alcoholism and to curb his anger which, rather than any pattern of criminality, were at the root of his offense. The professionals who have examined him have found no reason to believe he is likely to reoffend and in fact consider him less likely to engage in violence than "the average citizen." There is in the record no evidence to the contrary, and the Board has provided no explanation as to how or why the circumstances of petitioner's offense support an inference that he is likely to endanger others in the future.[2]

---

[2] Moreover, the circumstances of petitioner's crime are significantly less egregious than those in other cases in which the nature of the offense was found to support a finding of unsuitability. Our Supreme Court has upheld the denial of parole based on the circumstances of the commitment offense when the parole authority has "pointed to circumstances of the inmate's offense suggesting viciousness beyond the minimum elements of second degree murder." (*In re Dannenberg, supra,* 34 Cal.4th at p. 1095.) In *Rosenkrantz* the inmate had " 'brutally murdered' " the victim after " 'a full week of careful preparation, rehearsal and execution,' " firing 10 shots at close range from an assault weapon and at least three or four shots into the victim's head as he lay on the pavement. (*Rosenkrantz, supra,* 29 Cal.4th at p. 678.) In *In re Dannenberg* the inmate had reacted "with extreme and sustained violence," striking "multiple blows to his wife's head with a pipe wrench" and, it was inferred, while she was helpless from her injuries, placing her head into a bathtub full of water or at least leaving it there without assisting her until she was dead. (*In re Dannenberg, supra,* 34 Cal.4th at p. 1095.) In *In re Van Houten* (2004) 116 Cal.App.4th 339, 351 [10 Cal.Rptr.3d 406], the inmate participated in the premeditated, "gratuitous mutilation" of a married couple in which the wife was stabbed a total of 42 times and "struggled for her life while hearing her husband meet his gruesome fate." In *In re DeLuna, supra,* 126 Cal.App.4th at page 593, the inmate had a physical confrontation with the victim outside of a bar, retrieved a rifle, shot the victim in the mouth and then "deliberate[ly] stalk[ed the] defenseless victim" through the parking lot firing at him until he died. In *In re Lowe* (2005) 130 Cal.App.4th 1405, 1414 [31 Cal.Rptr.3d 1], the inmate, who had a special relationship of trust and confidence with the victim, purchased a gun shortly before the murder, entered the victim's bedroom while the victim slept " 'and shot him five times in the head and chest, execution style.' "

This record, like that in numerous recent cases, strongly suggests that California parole authorities are losing sight of the fact that "release on parole is the rule, rather than the exception." (*In re Smith, supra,* 114 Cal.App.4th at p. 351.) "[A] grant of parole is an integral part of the penological system intended to help those convicted of crime to integrate into society as constructive individuals as soon as possible and alleviate the cost of maintaining them in custodial facilities." (*People v. Vickers* (1972) 8 Cal.3d 451, 458, 455 [105 Cal.Rptr. 305, 503 P.2d 1313]; see also *Morrissey v. Brewer* (1972) 408 U.S. 471, 477 [33 L.Ed.2d 484, 92 S.Ct. 2593].) If he will pose no unreasonable risk to public safety, petitioner is entitled to be paroled and in fact is well beyond the point at which he became entitled to have a parole date set. (Pen. Code, § 3041, subd. (a); *In re Dannenberg, supra,* 34 Cal.4th at pp. 1078–1079.) The rote repetition year after year in the face of overwhelming evidence to the contrary that an inmate is considered too dangerous for parole because he committed a callous crime does not satisfy the mandates of California law. "An administrative policy of rejecting parole applications solely on the basis of the type of offense with the result that the term of imprisonment is automatically fixed at maximum, although the Authority action includes a pro forma hearing and review of the cumulative case summary, does *not* satisfy the requirements of individualized treatment and 'due consideration.' " (*In re Minnis* (1972) 7 Cal.3d 639, 647 [102 Cal.Rptr. 749, 498 P.2d 997].) The decision to uphold the denial of parole in this case cannot be reconciled with other recent decisions that have found similarly vacuous references to the callousness of a crime insufficient to satisfy even the minimal requirements of the "some evidence" standard. (*In re Scott, supra,* 133 Cal.App.4th at pp. 594–595; *In re Scott* (2004) 119 Cal.App.4th 871, 891 [15 Cal.Rptr.3d 32]; *In re Smith, supra,* 114 Cal.App.4th at pp. 366–367.)[3]

I do agree with the majority that it would be pointless to remand this matter to the Board despite our unanimous rejection of one of the two factors on which the Board relied in denying parole in 2004. The Board's subsequent denial of parole in May 2006 based solely on the commitment offense makes unmistakably clear that the Board would do so again upon a remand of its earlier parole denial. But comparison of the record of proceedings before the Board in 2004 with the record of the 2006 proceedings underscores the disingenuousness of what is occurring and reoccurring year after year in these proceedings. It is but slight exaggeration to say that the transcript of the 2006

---

[3] The recent decisions in this area admittedly are not all in harmony. The differences in approach which conflicting decisions reflect may indicate the need for Supreme Court intervention and clarification, but they do not justify automatic acceptance of every parole denial simply because the Board repeats the incantation that the commitment offense was a callous crime.

proceedings is a virtual carbon copy of the 2004 proceedings. The district attorney appearing before the Board in 2004 felt that petitioner's commendable progress was "fairly recent in terms of his threat to the community and we feel a little more . . . observation should be had in order to determine whether or not these gains will abide and will persist." The Board commended petitioner for the "positive aspects of his behavior," but without explanation concluded that they did "not outweigh the factors of unsuitability," namely, "[t]he commitment offense was carried out in a violent and brutal manner." Tellingly, the Board did not request a new clinical evaluation for the next parole hearing because "the current one is adequate." Two years later, in 2006, the same district attorney again acknowledged that petitioner "has made progress" but repeated that "it is recent. And we feel that he needs further observation to make sure that his admitted gains, which he has made, can be sustained." And the Board once again commended petitioner for "obtaining your GED; participating in Anger Management, the Men's Advisory Council, the Biblical Studies Program, and the Literacy Program; for being a literacy tutor; your vocations of: shoe repair; basic electronics; and four years worth of automotive service repair, that's quite a record; working as a clerk with above average work reports; and participating in AA since 1988; and also participation in your Chapel Services Program." But again, the Board reiterated that petitioner is "not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety" because "[t]he offense was carried out in an especially callous manner."

Petitioner was found to be suitable for parole in 1990. Other than a change in personalities and political climate, there is nothing in the record that explains why the Board rescinded this determination in 1995 or why petitioner is not even more suitable for parole 16 years later. There simply is no evidentiary or rational explanation in the record for the formulaic conclusion repeated at every hearing to deny petitioner parole. If the present record is sufficient to uphold a finding of unsuitability, there is no reason why this vacuous litany cannot be repeated for years to come. (See *In re Scott, supra*, 133 Cal.App.4th at p. 595, fn. 8; cf. *In re Smith, supra*, 114 Cal.App.4th at p. 372 ["if Smith's past use of drugs did invariably establish his unsuitability, then the Governor could deny parole for the rest of Smith's life based on this immutable factor, without regard to or consideration of subsequent circumstances"].) I believe it is the responsibility of the courts to insist that more than lip service be paid to the statutory and regulatory provisions governing an inmate's entitlement to parole. And, if California law is deemed to sanction such transparently perfunctory proceedings, petitioner is being denied due process of law. (See, e.g., *Biggs v. Terhune* (9th Cir. 2003) 334 F.3d

910, 916–917; *Irons v. Warden of California State Prison-Solano* (E.D.Cal. 2005) 358 F.Supp.2d 936, app. pending *sub nom. Irons v. Carey* (9th Cir. 2005) 408 F.3d 1165; *In re Dannenberg, supra,* 34 Cal.4th at p. 1104 (dis. opn. of Moreño, J.).) I would reverse and order the Board to set a date for petitioner to be released on parole.

A petition for a rehearing was denied August 8, 2006, and petitioner's petition for review by the Supreme Court was denied November 1, 2006, S146051. Kennard, J., and Moreno, J., were of the opinion that the petition should be granted.